NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES.

Suffolk. May 7, 1971. — November 11, 1971.

Present: TAURO, C.J., CUTTER, REARDON, QUIRICO, & BRAUCHER, JJ.

*Public Utilities. Telephone Company. Constitutional Law,* Public utilities.

Upon a reservation and report by the county court of an appeal under G. L. c. 25, § 5, for determination by this court on the record before the Department of Public Utilities of the validity of its order disallowing rates filed by a telephone company, this court accepted additional evidence, including copies of reports and tabulations, which had not been presented at the department's hearing but which the county court included in its report for determination whether it was "properly includible" therein, and upon remand of certain issues to the department, it should consider such additional evidence, subject to verification for accuracy, in disposing of the issues remanded. [448]

Upon an appeal under G. L. c. 25, § 5, by a telephone company challenging as confiscatory and unconstitutional an order of the Department of Public Utilities which disallowed rates filed by the company, it has a right to an independent judicial review as to both law and fact [449]; the standard of review was governed by G. L. c. 30A, § 14 (8) [449].

In a suit in equity under G. L. c. 25, § 5, to review a decision of the Department of Public Utilities on June 10, 1970, disallowing rates filed by a telephone company, where it appeared that the average value of the company's physical plant in service for the test year 1969, and the average value of plant held that year for future use, were much less than the values thereof respectively at the end of the test year, and that the department did not disregard the fact of inflation, it was held that the department was not required to use

444                                          360 Mass. 443

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

the year-end plant figures in computing the rate base for the test year. |450–453|

In a suit in equity under G. L. c. 25, § 5, to review a decision of the Department of Public Utilities on June 10, 1970, disallowing rates filed by a telephone company, where it appeared that the average value of the company's plant under construction during the test year 1969 was much less than the value thereof at the end of that year, and that the department added to the test year rate base the cost of the companys' capital investment in unfinished construction for" that year, it was held that there was no error in the department's exclusion of plant under construction from the 1969 rate base, thereby precluding a double return to the company |454–456|; it was without consequence that testimony of a witness for the department, and an alleged ruling for the company, were based on inclusion of plant under construction in the rate base [456–458].

Where it appeared upon an appeal by a telephone company under G. L. c. 25, § 5, for review of a decision of the Department of Public Utilities on June 10, 1970, disallowing rates, that the company maintained "average cash" balances with various banks during the 1969 test year from which it paid dividends and interest to its security holders and paid for new plant construction, and that the company, which had agreed to maintain minimum balances or to pay service charges, was unable to prove how much of such balances was required to avoid bank charges, it was held that the department properly excluded the average cash balances from the 1969 rate base. |458–469|

The Department of Public Utilities, in computing the rate base of a telephone company for the test year 1969, correctly reduced the value of the company's plant at cost by the amount of the "unamortized investment tax credit" allowed by the Internal Revenue Code of 1954, §§ 38, 46–48. |460–462|

In a suit in equity under G. L. c. 25, § 5, to review a decision of the Department of Public Utilities on June 10, 1970, disallowing rates filed by the New England Telephone and Telegraph Company, where it appeared that the company's average capital structure during the test year 1969 was 40% debt—60% equity, that on the date of the department's decision the company anticipated an immediate $150,000,000 debt issue and would then have a debt ratio of about 45%, and that there was no evidence that such ratio was other than reasonable, the department, in determining an appropriate debt ratio for a "fair rate of return," should then have determined the reasonableness of the 45% ratio, instead of using a. hypothetical debt ratio of 50% which resulted in a lower composite cost to the company of its debt and equity capital |463–469|; however, inasmuch as the decision must be remanded to the department for correction, it should make its new rate decision on the basis of the company's actual debt ratio after giving effect to its

New England Telephone & Telegraph Co. v. Department of Public Utilities.

debt issue of $175,000,000 on September 1, 1970 |469|.

The Department of Public Utilities, upon remand for correction of its June 10, 1970, decision disallowing rates filed by New England Telephone and Telegraph Company in which the department, in computing the company's overall cost of debt, used 8% as its cost of an anticipated debt issue of $150,000,000 in September, 1970, should now use 8.73% as the actual cost of a debt issue of $175,000,000 issued on September 1, 1970; furthermore, the department, in computing the overall cost of debt should now use the company's historic debt costs rather than the "total embedded Bell System debt costs for all issues outstanding through April 15, 1970" |469-471|; and should now use the company's actual debt ration, after giving effect to the $175,000,000 debt issue, rather than a hypothetical 50% debt ration assumed by the department |471|.

The decision of the Department of Public Utilities of June 10, 1970, disallowing rates filed by the New England Telephone and Telegraph Company, and fixing 9.9% as the fair rate of return on the company's equity capital, based on a hypothetical capital structure of 50% debt—50% equity, was not above the line of confiscation, and upon remand for correction of its decision, the department on all the evidence should now allow a return of no less than 11% on the company's equity capital, based on a capital structure of about 45% debt and 55% equity, in order to stay above the lowest range of reasonableness and to permit the company to attract new stock capital |471-478|; and the department, upon reconsideration of the composite cost of the company's debt and equity capital, should use 11% as the cost of its equity capital |478|.

The rate of return which a regulated public utility company was entitled to receive on reinvested surplus derived from both debt capital and stock capital was the same rate as that established for the composite return thereon, not the same rate of return as on its equity capital, as contended by the company. |478-479|

The Department of Public Utilities, upon remand for correction of its June 10, 1970, decision disallowing rates filed by a telephone company, and for reconsideration of its cost of capital in a manner indicated, which will reduce the amount of interest assumed by the department to be payable by the company, should consider the increase in the Federal income taxes, and perhaps other taxes, resulting from the reduction of interest payments |479-480|; the department should also reconsider its determination that the Federal surtax on income would not be an expense item for the company for any part of the year 1970, when in fact it was |480-481|; the department should also determine the annual increase in the company's social security taxes, which was not allowed in the department's computations for the 1969 test year |481|; and the department, in computing the municipal property taxes for the test year, should apply the estimated 1970 tax rates to the average of the January 1, 1969, and January 1, 1970,

446                                          360 Mass. 443

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

assessments on the real estate and personal property in service, without excluding new plant coming into service during the test year |481–482|.

It is the function and prerogative of the business managers of a regulated public utility company to decide as to the helpfulness to its business of "institutional" type advertising, and it was error for the Department of Public Utilities, in computing the test year expenses of a telephone company for rate making purposes, to disallow as a "cost of service" expenditures for advertising "designed to improve the image of the company, rather than to inform customers of new service or of other information which might be helpful or economical." |482–484|

A regulated public utility company may properly expend reasonable amounts for charitable purposes, and such expenditures qualify as operating expenses of the company for rate-making purposes. [484–490]

The Department of Public Utilities, upon remand for correction of its June 10, 1970, decision disallowing rates filed by a telephone company and for recomputation of the company's expenses for the test year 1969, should not exclude from such expenses 1970 wage increases to company employees solely because the company increased its net earnings, particularly in view of the decline in its rate of return on its increased plant investment. |490–492|

Upon appeal under G. L. c. 25, § 5, from a decision of the Department of Public Utilities on June 10, 1970, disallowing rates filed by a telephone company, where the department for 1969 test year purposes reduced the actual maintenance expenses of the company for 1969 by an amount purportedly covering maintenance work deferred from 1968 because of a strike in that year, and the department decided that the company had not sustained its burden of proving that deferred work was not included in its actual 1969 expenses, this court declined to substitute its judgment for that of the department |492–494|; however, upon remand of the case to the department for other reasons, it should review and reconsider its estimate of the company's test year maintenance expenses with the aid of verifiable additional evidence of its actual maintenance expenses for 1970 and a portion of 1971 |494|.

PETITION filed in the Supreme Judicial Court for the county of Suffolk on June 26, 1970.

The case was reserved and reported by *Quirico*, J.

*Robert W. Meserve* (*Laurence M. Johnson & Robert G. Bleakney, Jr.*, with him) for the New England Telephone and Telegraph Company.

*Herbert Baer*, Special Assistant Attorney General, for the Department of Public Utilities.

360 Mass. 443                                                   447

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

*Philip Raoul Tetu,* for The Telephone Answering Association of New England, amicus curiae, submitted a brief.

*Eli Goldston & Hans F. Loeser,* for The Massachusetts Bay United Fund, Inc., amicus curiae, submitted a brief.

QUIRICO, J.  This is an appeal by the New England Telephone and Telegraph Company (Company) from the final decision, orders and rulings of the Department of Public Utilities (Department) entered on June 10, 1970, in disposing of proposed tariff revisions filed by the Company on July 15, 1969.  The appeal was filed in the Supreme Judicial Court for the county of Suffolk (county court) under G. L. c. 25, § 5, as amended through St. 1956, c. 190. Because of the length of this opinion, a table of contents is appended hereto.

## HISTORY OF PROCEEDINGS.

The last general rate increases requested by the Company took effect in February, 1958.  On July 15, 1969, the Company filed a comprehensive tariff revision to take effect on August 15, 1969.  The Company estimated that the proposed rates would have produced increased revenues of $55,000,000 if they had been in effect during 1969.  On the same day the proposed rates were filed the Department suspended their operation until June 15, 1970, pending investigation.  G. L. c. 159, § 20 (as amended by St. 1939, c. 18).  It then held hearings, received evidence and heard arguments in the case on various dates between February 13 and May 29, 1970.  On June 10, 1970, the Department made its decision and orders which (a) disallowed the rate revisions filed by the Company on July 15, 1969, and (b) authorized the Company to file new revisions "designed to produce additional gross annual revenues of $7,713,000." The Company contends that the rates allowed by the Department represented an increase of about two per cent in the Company's gross annual revenues whereas the $55,000,000 requested by the Company would have repre-

sented an increase of about fourteen per cent. The Company issued such new revisions on June 19, 1970, for effect on July 10, 1970, without waiving its right to appeal to this court. It entered its appeal from the Department's decision and orders in the county court on June 26, 1970.[1]

On December 11, 1970, the case was reserved and reported by a single justice for the determination of the full court upon the record before the Department. The single justice also ordered that certain additional evidence which had not been presented at the hearing before the Department be included in the record on appeal, but his order expressly reserved, for ultimate decision by the full court, the question "whether said evidence is relevant, material, necessary or otherwise properly includible in the record on appeal." [2] We now accept and admit all of the additional evidence thus offered in order "to bring the proof as nearly as reasonably possible down to the date of final decision." *Opinion of the Justices*, 328 Mass. 679, 687. The Department may verify the accuracy of this additional evidence which consists in large part of information contained in reports filed with it by the Company. Such additional evidence, to the extent that it is verified and found accurate, shall be considered in the Department's disposition of the several issues remanded for its further attention. *Boston Gas Co.* v. *Department of Pub. Util.* 359 Mass. 292, 300.

---

[1] On application of the Company, a single justice entered an interlocutory decree on August 17, 1970, enjoining the Department "from preventing or interfering with the company in charging . . . such rates as are not in excess of sixty per cent (60%) of the rates and charges set forth in the schedule filed by the company on July 15, 1969," on condition that the Company post a bond in the penal sum of $4,000,000 to ensure repayment to its customers of charges in excess of the rates fixed by the Department by its orders of June 10, 1970, if such orders are upheld. The Company posted the required bond.

[2] This additional evidence included copies of reports and tabulations of (a) data on the Company's operations, investment and expenses for the first six months of 1970 and computations based thereon, (b) data concerning the Company's sale of $175,000,000 of debentures on September 1, 1970, and on sales of debentures by other telephone companies in 1970, (c) data on the price at which the Company's stock sold at the end of each month from May through September, 1970, and (d) affidavits explaining the statistical data.

360 Mass. 443                                                          449

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

NATURE AND SCOPE OF JUDICIAL REVIEW REQUESTED.

1. The Company alleges in its appeal that the "orders and rulings of the Department are confiscatory and unlawful in that they deprive the . . . [Company] of its property and appropriate the same to public uses without reasonable compensation and without due process of law, contrary to Articles X and XII of the Declaration of Rights of the Constitution of the Commonwealth." It contends, and properly so, that under these allegations it is entitled to an independent judicial review as to both law and fact. *Mystic Valley Gas Co.* v. *Department of Pub. Util.* 359 Mass. 420, 424, and cases cited.

2. The Company also alleges in its appeal that "the Department's decision, orders and rulings are unlawful . . . in that . . . [they] are based upon errors of law, are unsupported by substantial evidence, are unwarranted in the facts contained in the record, are arbitrary and capricious and constitute an abuse of . . . discretion." It contends, and again properly so, that under these allegations the standard of review is governed by G. L. c. 30A, § 14 (8).

SUMMARY OF ISSUES INVOLVED.

The issues raised by this appeal arise from the following principal areas of decision or rulings by the Department:

1. *Rate Base.* The Company contends that the Department, in computing the Company's rate base for the test year 1969, committed the following errors: (a) it used the average value of the plant in use during the test year rather than the value at the end of the test year, and (b) it excluded the amounts of the following items from the computation of the rate base: plant under construction, certain money on deposit with banks, and the item of "unamortized investment [tax] credit."

2. *Rate of Return.* The Company contends that the Department, in determining the rate of return to which the Company was entitled, committed the following errors: (a) it fixed a rate of return which was inadequate to attract

450                                      360 Mass. 443

New England Telephone & Telegraph Co. v. Department of Public Utilities.

necessary capital, and (b) it used a hypothetical, rather than the actual capital structure of the Company.

3. *Test Year Expenses.* The Company contends that the Department, in computing the Company's expenses for the test year 1969, committed the following errors: (a) it did not properly compute the Federal income, social security and municipal property taxes, (b) it underestimated wages and maintenance expenses, and (c) it wrongfully disallowed expense items relating to advertising and charitable contributions.

## RATE BASE.

A basic factor in the determination of rates which may properly be charged by a regulated utility company is the amount of the investment on which the company is entitled to an opportunity to earn a fair and reasonable return. This amount is commonly referred to as the company's "rate base." In this case the Department found and decided that the Company's rate base was $894,531,000. The Company contends that the Department should have found the rate base to be $1,008,467,000. This difference of $113,936,000 results in part from the Department's exclusion of several classes of property which the Company contends should be included in the rate base, and in part from the use of average rather than year-end plant investment for the test year.

1. *Plant Included in Test Year Rate Base: Average Amount vs. Year-End Amount.* The largest component part of the rate base, in dollar amount, is the physical plant in service, less depreciation. The average amount of such plant, before depreciation, for the test year 1969 was found by the Department to be $1,230,540,000. The amount of such plant computed at the end of the test year was $1,284,343,000. The Department computed the rate base by using the average figure and the Company contends it should have used the year-end figure. The same disagreement exists as to plant held for future use which the Department included at the test year average amount of $858,000 and which the Com-

360 Mass. 443                                         451

New England Telephone & Telegraph Co. v. Department of Public Utilities.

pany contends should have been included at the year-end figure of $966,000.[3]

The basic argument by the Company in support of its contention is that use of the higher year-end amount is necessary to protect it from the adverse effect of erosion or attrition in its rate of return. In declining to use the year-end plant figures the Department stated that some of the evidence demonstrated "that under a given set of rates, projected increases in rate base and expense will not necessarily result in a decline in the rate of return, because revenues will tend to increase, and efficiencies created by the new plant will offset some aspects of expense increases." The Company counters with the argument that the record demonstrates clearly that "investment and expenses were growing *faster* than revenues, thereby necessarily eroding its rate of return."

This is but one part of the Company's general contention that the Department, in arriving at its ultimate decision, did not give sufficient effect to the acknowledged inflationary trends in the cost of plant construction and expense of service to customers in fixing the outer limits of the gross revenue which it permitted the Company to receive during the period of such rising costs and expenses. The Department did not disregard the fact of inflation. In its decision it said that "[c]learly inflation is a fact of economic life." It then continued: "Recognition of its existence, however, does not dictate any particular regulatory policy. It must be evaluated in terms of its significance to the rate of earnings of the Company, and appropriate allowance should be made for it, but it does not differ from any other factor influencing rate of return and the basis for making the adjustment should be at least as rational as the basis for any other adjustment in arriving at a proper level of income for the Company." At this point in this decision we are not

---

[3] The item of working capital, which in its several parts is the other principal component part of the rate base, was computed at average amounts for the test year by both the Department and the Company.

concerned with the question whether the Department did or did not give sufficient effect to the factor of continuing inflation, but only with the question whether it was required to do so by using the year-end plant figures in the rate base for the test year. We hold that it was not.

The test year approach to rate making is a practice which has long been followed by the Department and by comparable authorities in other jurisdictions. In using such approach, some authorities employ the average amount of the plant in service during the test year in computing the rate base,[4] while others, generally because of unusual additions to plant in the test year, permit computation of the rate base on the basis of the year-end plant in service.[5] With the exception of one case involving the Company, *Re New England Tel. & Tel. Co.* 22 P. U. R. 3d 470, 481 (Mass. Dept. of Pub. Util.), the Department has consistently used the average plant investment in computing the test year rate base.[6]

---

[4] *Narragansett Elec. Co.* v. *Kennelly,* 88 R. I. 56, 72–73. *Re Southwestern Bell Tel. Co.* 57 P. U. R. 3d 239, 243 (Kans. State Corp. Commn.). *Re Mountain States Tel. & Tel. Co.* 78 P. U. R. 3d 429, 436 (Utah Pub. Serv. Commn.). *Re Wisconsin Pub. Serv. Corp.* 81 P. U. R. 3d 39, 42–43 (Wis. Pub. Serv. Commn.). *Washington Util. & Transp. Commn.* v. *Pacific Northwest Bell Tel. Co.* 81 P. U. R. 3d 371, 377–378 (Wash. Util. & Transp. Commn.). *Re Pacific Northwest Bell Tel. Co.* 82 P. U. R. 3d 321, 338–339 (Ore. Pub. Util. Commr.). *Re General Tel. Co. of the Southeast,* 84 P. U. R. 3d 467, 476–477 (Ga. Pub. Serv. Commn.). *Re General Tel. Co. of the Southeast,* 86 P. U. R. 3d 321, 329 (Tenn. Pub. Serv. Commn.). *Re Intermountain Gas Co.* 86 P. U. R. 3d 438, 441 (Idaho Pub. Util. Commn.). *Re Southern Bell Tel. & Tel. Co.* 86 P. U. R. 3d 449, 455 (Ga. Pub. Serv. Commn.).

[5] See cases cited in *Boston Gas Co.* v. *Department of Pub. Util.* 359 Mass. 292, 309, n. 21; *Miami* v. *Florida Pub. Serv. Commn.* 208 So. 2d 249, 258 (Fla.); *Baltimore Gas & Elec. Co.* v. *McQuaid,* 220 Md. 373, 381–382; *North Carolina ex rel. North Carolina Util. Commn.* v. *Piedmont Natural Gas Co. Inc.* 254 N. C. 536, 551–552; Priest, Principles of Public Utility Regulation, 181–183.

[6] *Re New England Tel. & Tel. Co.* 70 P. U. R. (N. S.) 56, 58 (Mass. Dept. of Pub. Util.). *Re New England Tel. & Tel. Co.* 83 P. U. R. (N. S.) 238, 272–274 (Mass. Dept. of Pub. Util.), revd. in part on other grounds, 327 Mass. 81. *Re New England Tel. & Tel. Co.* 2 P. U. R. 3d 464, 471, 474–475, modified on other grounds, 2 P. U. R. 3d 501, 502–503 (Mass. Dept. of Pub. Util.), revd. in part on other grounds, 331 Mass. 604, final order, *Re New England Tel. & Tel. Co.* 7 P. U. R. 3d 572, 578 (Mass. Dept. of Pub. Util.). *Re New England Tel. & Tel. Co.* 7 P. U. R. 3d 580, 581 (Mass. Dept. of Pub. Util.).

In earlier decisions involving the Company we used language referring to the Company's average net rate base. In *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 84, we stated that the parties presented a stipulation as to "the average 1949 Massachusetts intrastate rate base upon which the company was entitled to a fair return." In *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 331 Mass. 604, 607, 609, 610, we used the words "average net intrastate investment" and "average net investment" in discussing the Company's rate base. However, the practice of using an average rather than a year-end rate base was not put in issue in either of those cases, and therefore they are not precedents on the subject. In the later of those two decisions, we said, at p. 616, that we would not construe the Constitution of this Commonwealth as compelling "the use of any particular theory or method or combination of theories or methods for determining a rate base," and that "[w]e would not be justified in laying hold of any part of our fundamental law for the purpose of overriding the department merely because a particular approach to rate regulation was not used." On the same reasoning, this court will not set aside the Department's decision and orders in this case simply because it used an average rate base for the test year rather than the year-end rate base unless that particular practice resulted in rates which are confiscatory. See *St. Joseph Stock Yards Co.* v. *United States*, 298 U. S. 38, 53.

Nothing which we have said above is intended to be a holding that the Department must use an average test year rate base rather than a year-end test year rate base. Although we have previously referred to the use of a year-end rate base as an "imprecise method of taking account of attrition," we have also noted that "[i]f erosion is shown to have taken place, and a year-end rate base is deemed unsuitable, some other suitable form of compensatory attrition adjustment can be made." *Boston Gas Co.* v. *Department of Pub. Util.* 359 Mass. 292, 309 n. 21, and 310.

2. *Plant under Construction.*  The Company's plant under construction amounted to an average of $42,456,000 during the test year 1969, and to $53,013,000 as of December 31, 1969.  These figures represent items of plant in various stages of construction but not yet completed and therefore not yet serving the Company's customers.  The Company contends that the total amount of such plant under construction should be included in the test year rate base at the year-end amount, and the Department decided that no part of it should be included.

In the exercise of its rate-making power the Department has consistently followed the practice of excluding the amount invested in plant under construction from the rate base.[7]  It has, however, also consistently followed the practice of permitting a utility company to add to the cost of the plant thus constructed the interest or other cost of the capital used for such new plant up to the time it goes into service.[8]  In this case the Company computed its interest on such capital at 6.5% for plant under construction in 1969.  The Department held that 6.5% was less than a fair rate of return for such capital and recomputed it at a rate which added $457,000 to the Company's computation.[9]  The De-

[7] *Re New England Tel. & Tel. Co.* 83 P. U. R. (N. S.) 238, 274–276 (Mass. Dept. of Pub. Util.), revd. in part on other grounds, 327 Mass. 81.  *Re New England Tel. & Tel. Co.* 96 P. U. R. (N. S.) 580, 583 (Mass. Dept. of Pub. Util.).  *Re New England Tel. & Tel. Co.* 2 P. U. R. 3d 464, 471–472, modified on other grounds, *Re New England Tel. & Tel. Co.* 2 P. U. R. 3d 501 (Mass. Dept. of Pub. Util.), revd. in part on other grounds, 331 Mass. 604, final order, *Re New England Tel. & Tel. Co.* 7 P. U. R. 3d 572 (Mass. Dept. of Pub. Util.).

[8] *Re New England Tel. & Tel. Co.* 83 P. U. R. (N. S.) 238, 274–276 (Mass. Dept. of Pub. Util.), revd. in part on other grounds, 327 Mass. 81.  *Re New England Tel. & Tel. Co.* 2 P. U. R. 3d 464, 471–472, modified on other grounds, *Re New England Tel. & Tel. Co.* 2 P. U. R. 3d 501 (Mass. Dept. of Pub. Util.), revd. in part on other grounds, 331 Mass. 604, final order, *Re New England Tel. & Tel. Co.* 7 P. U. R. 3d 572 (Mass. Dept. of Pub. Util.).

[9] While the Department did not describe the precise method used in computing this amount, it said in its decision: "To the extent that interest during construction was inadequate during the test year we will include in the rate base as additional plant in service $457,000 representing the difference between interest actually charged at 6.5% during 1969 and what that interest would have been had the fair rate of return been used."  If this sum was based on any rates of return, costs of capital, amounts of plant or computations which are changed by the Department on remand, this sum should be changed accordingly.

360 Mass. 443      455

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

partment then added the $457,000 to the test year rate base.

The Company agrees with the action of the Department in adding to the rate base for 1969 the Company's cost, computed on a fair return basis, of its capital invested in unfinished construction for that year. However, the Company contends that in addition thereto the Department should also have added to the rate base the principal amount of the Company's investment in the unfinished construction. Of course if the Company stopped at that point, it would be seeking, for the same investment, a double return to which it would not be entitled. "The cases make it clear that usually there will be included as part of the rate base either capitalization of interest during construction or the value of plant under construction, but not both since this would mean a duplication." *Baltimore Gas & Elec. Co.* v. *McQuaid*, 220 Md. 373, 380, and cases cited. In *New England Tel. & Tel. Co.* v. *New Hampshire*, 95 N. H. 353, 365, it was held that when "interest upon unfinished construction is capitalized by the Company . . . by almost universal rule, exclusion [of cost of plant under construction] from the base is held proper to prevent a double return."

The Company acknowledges that if its investment in plant under construction were included in the rate base, and the interest on the cost of such plant were also added to the rate base, the result would be a double return to the Company unless some other adjustment were made. To avoid such a result the Company proposes that it be permitted to adjust its operating income upward in each year by the amount of capitalized plant construction interest being charged in that year. Such an accounting procedure would produce the same result as including the plant under construction in the rate base in the first place without capitalizing the cost of interest on the investment in such plant during the period of construction. There was no error in the Department's exclusion of plant under construction from the rate base. Neither was there error in its refusal to permit accounting procedures which would produce the same result as the inclusion of such unfinished plant in the rate base.

Numerous judicial or regulatory agency decisions can be found in support of either the Department's [10] or the Company's [11] approach on this matter. The majority view appears to support the Department's approach. For scholarly discussions of the two approaches and their respective features and consequences on rate making, see Bonbright, Principles of Public Utility Rates, 178–180, Phillips, The Economics of Regulation, 252–253, and Priest, Principles of Public Utility Regulation, 178–180.

Just as we have noted above that there is no constitutional requirement that the Department use a year-end rather than an average test year rate base, there is likewise no constitutional requirement that the Department, in the exercise of its rate-making power, should or should not include plant under construction in computing the Company's rate base. This court is not justified in overruling the action of the Department merely because it used one approach rather than another in this regard.

The fact that the witness Bolster called by the Department gave testimony and prepared an exhibit which were based on the inclusion of plant under construction in the rate base did not preclude the Department from deciding that it should not have been included. The Department was not bound by his testimony. It was free to decide

---

[10] *Petition of Mountain States Tel. & Tel. Co.* 76 Idaho, 474, 485. *New England Tel. & Tel. Co.* v. *New Hampshire,* 95 N. H. 353, 364–365. *Narragansett Elec. Co.* v. *Kennelly,* 88 R. I. 56, 75–76. *Petition of New England Tel. & Tel. Co.* 115 Vt. 494, 504–505. *Petitions of New England Tel. & Tel. Co.* 116 Vt. 480, 483–484. *Re Wisconsin Pub. Serv. Corp.* 81 P. U. R. 3d 39, 42–43 (Wis. Pub. Serv. Commn.). *Washington Util. & Transp. Commn.* v. *Pacific Northwest Bell Tel. Co.* 81 P. U. R. 3d 371, 379 (Wash. Util. & Transp. Commn.). *Re Pacific Northwest Bell Tel. Co.* 82 P. U. R. 3d 321, 340–341 (Ore. Pub. Util. Commr.). *Re General Tel. Co. of the Southeast,* 84 P. U. R. 3d 467, 477 (Ga. Pub. Serv. Commn.).

[11] See *Re Consolidated Edison Co. of N. Y. Inc.* 96 P. U. R. (N. S.) 194, 378–384 (N. Y. Pub. Serv. Commn.), in which the Commission stated and discussed, but did not apply, the rule advocated by the Company in this case. See also *Re American Tel. & Tel. Co.* 9 F. C. C. 2d 960, 972, in which the Federal Communications Commission modified its interim decision in the same case, reported in 9 F. C. C. 2d 30, by including plant under construction in the rate base, but in so doing stated: "We wish to make it clear in adopting this course, we do not find or imply in any way that other methods of treating plant under construction are improper under other circumstances."

360 Mass. 443                                                    457

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

whether to believe or disbelieve his testimony, and what weight to give thereto, just as it was with reference to all other witnesses. See *Harrison* v. *Boone County Tel. Co.* 4 P. U. R. (N. S.) 121, 124–125 (Ark. Fact Finding Tribunal). Cf. *Salem Trust Co.* v. *Deery,* 289 Mass. 431, 435; *Fulton* v. *Edison Elec. Illuminating Co. of Boston,* 303 Mass. 258, 263–264; *Graham* v. *Jordan Marsh Co.* 319 Mass. 690, 693; *New England Tel. & Tel. Co.* v. *State,* 104 N. H. 229, 236.

As to the Department's exclusion of plant under construction from the rate base, the Company makes the additional argument that such action was erroneous because it was inconsistent with the Department's allowance of the following ruling requested by the Company: "21. Upon all the evidence, a finding is required that telephone plant under construction (Account 100.2) is properly to be included in any 1969 Massachusetts instrastate rate base." The Company filed fifty-one requests for rulings. About one-half of the requests were for rulings to the effect that certain described findings, conclusions, decisions or orders were warranted or were not warranted on the evidence. Many of the other requests were for rulings that the findings, conclusions, decisions or orders specified therein were required on the evidence. The Department's decision and orders which are the subject of this appeal cover about sixty pages of the printed record on appeal. The first fifty-nine pages contain the Department's decision, including two full pages discussing why it excluded the plant under construction from the rate base. At the end of the fifty-ninth page of the decision, the Department disposed of the Company's requests for rulings, specifying by number those which it denied and allowing "the remainder." The request in question fell in the latter group.

The Department concedes in its brief that its "holding and reasoning . . . was directly contrary to that ruling [allowing request numbered 21]," and argues that the ruling "was obviously a scrivener's error, not excusable, but per-

haps understandable in view of the 51 different requests filed." There is nothing in the record which enables us to determine whether or not the ruling on the request in question was "a scrivener's error." In *L. Grossman Sons, Inc.* v. *Rudderham*, 319 Mass. 698, 699–700, we said, "Requests of this sort, for a ruling that the evidence warrants a finding in favor of the party making the request, . . . have caused inexplicable confusion in many minds. Careful and repeated exposition has not availed to prevent blunders in dealing with them. . . . The trap set by such a request is perilous to the unwary but easy to avoid." Where, as in the present case, we have an intermixture of requests for a ruling that the evidence warrants a finding in favor of the party making the request with requests that it requires such a finding, the confusion seems to be multiplied to the point where the peril which they present to the unwary is not easy to avoid.

Notwithstanding the inconsistency between the Department's findings and its ruling on the request in question, we hold· that the Company is not entitled to any relief on the basis of that ruling alone. If the Department in fact allowed the requested ruling that the plant under construction was required to be included in the 1969 rate base, such a ruling was erroneous. The Department was not required, as matter of law, to include this item in the rate base. Its findings and ruling thereon in the body of its decision excluding this item from the rate base were legally correct for reasons which we have already discussed. The Company cannot benefit from a ruling which, if made, was not legally correct, or from any inconsistency between such ruling and a contrary but correct ruling contained in the body of the Department's decision.

3. *Working Capital.* The test year rate base as proposed by the Company and. as computed by the Department included the following elements of the item of working capital:

|  | *Proposed by Company* | *Computed by Department* |
|---|---|---|
| Operating expenses advanced | $6,989,000 | $6,989,000 |
| Material and supplies paid for | 3,483,000 | 3,482,000 |
| Average Cash | 3,647,000 | |
| Working funds advanced to employees | | 244,000 |
| Totals | $14,119,000 | $10,715,000 |

The Company's proposed $3,647,000 for "Average Cash" included an unspecified sum for "working funds advanced to employees." On the basis of testimony and an exhibit of its own witness, the Department found this unspecified sum to be $244,000 which it allowed. It disallowed the remaining $3,403,000 which consisted of cash which the Company had on deposit with various banks.

The principal ground on which the Company contends that the disputed sum of $3,403,000 should have been included in the rate base is that under agreements between the Company and the banks with which such sum was deposited, it was necessary to maintain minimum balances in such a total sum in order to avoid payment of charges to the banks. The agreements were not put in evidence, and there was no testimony or other evidence of the terms of the agreements. There was no evidence as to how much the bank charges would be if the minimum balances were not maintained. There was no evidence of the amount which the Company was required to maintain on deposit with any bank or banks under the agreements. The figure of $3,647,000 proposed by the Company as the "average cash" required, and from which the disputed sum of $3,403,000 is derived, was arrived at by using the average of the balances which the Company actually maintained with the banks in question during the year 1969. These accounts in which the Company agreed to maintain minimum balances or in lieu

460 · 360 Mass. 443

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

thereof to pay service charges to the banks were used in part as the source from which the Company paid dividends and interest to the holders of its securities and from which it paid for the construction of new plant.

The Department properly held that to the extent that the deposits in question represented money accumulated by the Company for plant construction or for payment of dividends or interest to the holders of its securities, they were not includable in the rate base. The deposits for such purposes were not applied to the serving of the Company's customers. In its decision the Department said that "the necessity of minimum bank balances in order to avoid bank charges . . . might be appropriately borne by the customers," but that the accumulation of cash for dividends and interest "relates to capital transactions and . . . [is] more properly borne by the investors." It then in effect concluded that since the Company had not sustained the burden of proving how much of the $3,403,000 was required to avoid bank charges as distinguished from accumulations for capital purposes, it disallowed the entire amount.[12] We agree that the Company did not sustain its burden of proof on this point, but in so doing, we express no opinion on the question whether bank deposits maintained for the sole purpose of avoiding bank service charges should be included in the rate base of a public utility company.

4. *Unamortized Investment Tax Credits.* For each of the years 1962 through 1968, the Company's otherwise normal Federal income tax liabilities and payments were reduced by the "investment tax credit" provisions of the Internal Revenue Code, Int. Rev. Code of 1954, §§ 38, 46–48, inserted by 76 Stat. 960–973, permitting the Company to deduct from its normal tax a sum equal to three per cent of most of its capital expenditures for the particular year.

---

[12] The decision states: "However, since the Company merely included the amounts actually carried without any break-down of or justification for these amounts, there is no basis for determining how much, if any, cash requirements should be borne by customers."

360 Mass. 443                                                    461

New England Telephone & Telegraph Co. v. Department of Public Utilities.

Despite such reduced tax payments, the Company made adjustments and entries on its books of account and reports to the Department as follows: (a) it computed and entered the normal Federal income tax which would have been payable if it had not deducted the three per cent income tax credit, (b) it placed the amount of the investment credit deduction for each year in a reserve account entitled "unamortized investment tax credit," (c) it determined the life of the particular article of plant for which it received the benefit of the tax deduction, and (d) in each year of the life of such article it charged or reduced that reserve account and simultaneously credited income available for interest, dividends and surplus by the amount of that year's amortization for each item of plant for which it had received the tax credit. The average life of such articles was twenty years. The amount by which the Company proposed to reduce the "unamortized investment tax credit" account for 1969 was $914,000. The total amount accumulated to that time and not previously amortized was $13,367,000.[13]

The Company's proposed handling of this special tax deduction would have the effect of spreading the saving over the life of the article of plant which gave rise to the tax saving, rather than applying it in full to the year in which the capital expenditure was made. There appears to be no issue between the parties concerning the particular accounting practice which the Company elects to follow in this regard. The issue presented for our decision is whether the Department was correct in holding that in computing the Company's rate base, the cost of its plant should be reduced by the amount of $13,367,000 representing the unamortized portion of the benefits received by the Company from the application of the investment tax credit provisions of the income tax law. We hold that the action

---

[13] The Tax Reform Act of 1969, § 703, 83 Stat. 487, 660, repealed, in general, the investment tax credit provisions for property acquired or constructed after April 18, 1969. The record before us does not disclose the amount of such credit, if any, applicable to the period from January 1, 1969, to April 18, 1969.

of the Department was correct. In so doing we assume that the plant which resulted in these tax benefits was entered on the Company's books at its cost without deduction therefrom of the tax credits. The effect of the tax credits was to reduce by three per cent the cost to the Company of most of its plant constructed in the years 1962 through 1968. The plant giving rise to such credits should therefore become a part of the rate base at its cost as thus reduced. The same conclusion was reached in *Pittsburgh* v. *Pennsylvania Pub. Util. Commn.* 208 Pa. Super. 260, 273–274, where the court said: "It is clear . . . that the investment tax credit is calculated directly from the cost of the newly installed property. The commission treated the credit, therefore, as a reduction in the cost of the property and deducted the unamortized portion thereof from the original and trended cost measures of value. . . . We find no abuse of discretion or error of law in the commission's treatment of the utility's investment tax credit." *Re New York Tel. Co.* 84 P. U. R. 3d 321, 347 (N. Y. Pub. Serv. Commn.). (See *New York Tel. Co.* v. *Public Serv. Commn.* 29 N. Y. 2d 164, ordering reopening of hearings on grounds not material to this part of the present decision.) *Re Newport Gas Light Co.* 85 P. U. R. 3d 257, 259 (R. I. Pub. Util. Commn.). *Re General Tel. Co. of the Southeast,* 86 P. U. R. 3d 321, 329 (Tenn. Pub. Serv. Commn.). See the discussion in *Williams* v. *Washington Metropolitan Area Transit Commn.* 415 F. 2d 922, 962–963, and n. 237 (D. C. Cir.), cert. den. sub nom. *D. C. Transit Sys. Inc.* v. *Williams,* 393 U. S. 1081.

RATE OF RETURN — CAPITAL STRUCTURE OF COMPANY.

1. *General.* In this, as in previous rate proceedings involving the Company, the Department adopted and applied the "cost of capital" method of determining the fair rate of return upon the Company's rate base. "As to debt capital this means that the company is entitled to earnings which

will pay its actual interest obligations as they accrue on existing debt capital and upon new debt capital required in the immediate future, and as to stock capital . . . it means 'the amount which the company would have to pay in order to "hire" its equity capital under current conditions.' " *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 88. This method of determining the cost of capital involves (a) a determination of the relative portions of the Company's total capital which are the proceeds of debt financing and of equity financing, commonly referred to as the debt or the equity ratio, (b) the cost to the Company of each of these two kinds of capital, and (c) the composite cost of the Company's entire capital, as resulting from the debt and equity ratios and the costs of each of the two kinds of capital.

2. *Debt Ratio of Company in Prior Proceedings.* When the Company sought approval of rate increases in 1947, it had a debt ratio of 62.1%, and it proposed rates computed on an anticipated reduction in the debt ratio to 35%. The Department allowed an increase based on a hypothetical debt ratio of 45% and its action in that regard was upheld by this court in 1951. *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 89–91. By the same decision (p. 102) we ordered the Department to establish rates producing a greater rate of return to the Company than those then under consideration. The Department did so and the case was again before us in 1954. *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 331 Mass. 604. By that time the Company had reduced its debt ratio to 36.1%, and the Department still used a hypothetical debt ratio of 45% (p. 607). We again upheld this action of the Department (pp. 617–619). Those decisions did not bind the Company to attain or maintain a debt ratio of 45%. Neither do they bind either the Department or this court with reference to the debt ratio to be used in the present rate proceeding which was started many years after those decisions. The present case is to be decided on the facts

existing at or about the time of and immediately following the decision of the Department on June 10, 1970.

3. *Actual Debt Ratio of Company in Present Proceeding.* The average debt ratio for the Company during the test year of 1969 was 40%. The Department's decision includes a finding that "[t]he Company expects to issue $150,000,000 of long-term debt during 1970." There was evidence that the effect of this debt issue would be to increase the Company's debt ratio to about 45.7%. The Company in fact issued $175,000,000 of thirty-nine year debentures on September 1, 1970.[14]

4. *Hypothetical Capital Structure Attributed to Company by Department.* In its decision the Department found that the Company's projected debt ratio after the proposed 1970 issue of $150,000,000 debt would be 45.7%. However, it found further that "a 50 percent debt ratio is the appropriate ratio for determining the Company's fair rate of return." The opinions expressed by witnesses concerning the appropriate debt ratio for the Company ranged from a low of 40% from Company witnesses to a high of 50% from Department witnesses. The Department accepted the opinions of its own witnesses, and said that "[t]he evidence to support a lower ratio is wholly unconvincing." It is apparent that an important factor in the Department's rejection of the opinions of the Company witnesses was the fact that the Company had not previously moved to a 45% debt ratio when debt capital was less expensive.[15] In its decision of June 10, 1970, the Department tabulated the attractive low cost of debt capital prevailing during the

---

[14] This fact was a part of the evidence offered by the Company in a "Motion for Inclusion of Additional Evidence in the Record on Appeal" filed in the county court and referred to in fn. 2, *ante.*

[15] In its decision the Department said in part: "However, the weight which we have accorded the Company's testimony on capital structure has been influenced by the results of the Company's continuous refusal to achieve the debt ratio of 45 percent which we found to be appropriate in January, 1958 (D. P. U. 12107) and its belated plans to move to a 45 percent debt ratio by the end of this year."

360 Mass. 443                                        465

New England Telephone & Telegraph Co. v. Department of Public Utilities.

years 1958 through 1969 during which the Company made five stock offerings in the total amount of $544,930,000, and then criticised the Company for moving to increase its debt ratio to about 45% now when the cost of debt capital is higher than formerly. Such criticism from hindsight is of questionable merit in view of the difficulties in predicting fluctuations in the money market. It is even more questionable when made without stating that during the same twelve-year period the Company increased its debt capitalization by $443,231,000. Thus the new debt capital represented just slightly less than 45% of the total new capital raised in that period, and the ratio would be more than 45% if the 1970 debt issue of $175,000,000 were considered.[16]

5. *Authority of Department to Attribute Hypothetical Capital Structure to Company.* It is now clear that in certain circumstances the Department may disregard the actual capital structure of a regulated utility company and attribute to it a hypothetical capital structure for the purpose of rate making. The use of that authority was approved by this court in two earlier cases involving the Company. In *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 89–91, the Department applied a hypothetical debt ratio of 45% instead of the debt ratio of 35% proposed by the Company. We approved the Department's action noting that, in a rate proceeding in which the Company is seeking additional capital, the Department should be allowed to consider debt ratio, which "substantially affects the manner and cost of obtaining new capital" (p. 90). In the second case, *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 331 Mass. 604, the Department again applied a hypothetical debt ratio of 45% instead of the Company's then actual ratio of 36.1%. Again we approved the Department's action, pointing out, as in the earlier case, that

---

[16] Table 1 of exhibit 5 prepared by the Company's witness Arthur L. Coburn, Jr., shows the Company debt, including short-term debt, for each of the years 1958 through 1969. For 1958 it was $289,700,000 and for 1969 it was $732,931,000, the increase being $443,231,000. What part, if any, of the proceeds of the 1970 debt issue of $175,000,000 was used to retire short-term debt is not shown in the record before us.

"debt structure and the percentage of debt and equity capital enter vitally into the determination of the amount which the consuming public should pay" (p. 618).

In two recent decisions we have had occasion to review and reconsider the extent of the authority of the Department to disregard the actual capital structure of a utility company seeking rate increases and to substitute its own opinion as to what the capital structure should be. *Boston Gas Co.* v. *Department of Pub. Util.* 359 Mass. 292, 296–302. *Mystic Valley Gas Co.* v. *Department of Pub. Util.* 359 Mass. 420, 427–433. In both cases we held that the facts did not warrant the Department's use of a hypothetical capital structure instead of the actual capital structure.

The facts in the *Boston Gas Co.* case closely parallel those of the present case. There the company's debt ratio at the time of the hearings before the Department was 53.7%. Evidence before the Department indicated that the company anticipated that shortly thereafter it would issue sufficient debt securities to bring its debt ratio up to 60%. This additional debt had not been incurred on the date of the Department's decision on January 8, 1970. The company did increase its debt thereafter, but for valid reasons it was limited to an amount which increased it to only 56% instead of the anticipated 60%. In deciding the case the Department used a hypothetical debt ratio of 60% in computing the company's cost of capital. The company contended that it should have been treated as having a debt ratio of 56%. We upheld the company and in so doing we said at pp. 301–302: "It would be unreasonable, and an undue interference with reasonable Company judgment, for the . . . [Department] to insist that Company's rate of return conform with precision to what the . . . [Department] regards as an optimum 60% debt ratio. Within a substantial range this is a matter for Company's determination. . . . There is no evidence that (in disregard of fair and prevailing utility practice or of . . . [Department] admonitions) Company has adopted an unreasonably low

debt ratio which may be regarded as a 'company luxury' imposing an undue burden on consumers." We then concluded that the Boston Gas Company was entitled to earnings which would pay its actual interest obligations on existing debt capital and upon new debt capital required in the immediate future.[17]

In the *Mystic Valley Gas Co.* case the company had a capital structure of 61.8% debt and 38.2% common stock, and it had no plans to change it in the immediate future. In deciding the case the Department held that the "suitable capital structure" for the company was 60% debt, 9% preferred stock, and 31% equity. The Department sought to support its action in part by language contained in our decisions in *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 87, 91–92, and *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 331 Mass. 604, 618. We held that the Department's action was not proper, and in so doing we said, at p. 429: "These two telephone decisions, in our opinion, do not permit the . . . [Department] to disregard (in fixing rates) existing capital structures of regulated companies unless they so unreasonably and substantially vary from usual practice as to impose an unfair burden on the consumer."

6. *Application of Rule to This Case.* In its decision of June 10, 1970, the Department found that the Company's test year debt ratio was 40% and also that the Company "had plans to move to a 45 percent debt ratio by the end of this year." The Company did move to approximately a 45% debt ratio on September 1, 1970. It was apparent on the date of the decision that in the then immediate future the Company would have a debt ratio of 45%. Yet the Department chose to whip the dead, although not buried, 40% debt ratio, and decided that "a 50 percent debt ratio

---

[17] The conclusion was based in part on events which occurred after the hearing and decision by the Department. The evidence of such subsequent events was placed before this court in substantially the same manner as was done in the present case. See fn. 2, *ante.*

is the appropriate ratio for determining the Company's fair rate of return." We believe that in the determination of rates for future application the Department should have considered the reasonably foreseeable impending change in the debt ratio to 45% and determined whether that was or would be reasonable. The Department made no finding that a 45% debt ratio so unreasonably or substantially varied from usual practice as to impose an unfair burden on the consumer, nor did the evidence warrant such a finding. There was likewise no evidence to warrant a finding that the 45% debt ratio was not within the range of reasonableness. In none of the many cases cited by the Department as using or approving the use of a hypothetical capital structure was there an increase of an actual debt ratio of 45% to a higher hypothetical figure. Neither was the difference between the actual and the hypothetical debt ratio in any of those cases as low as the 5% difference we have here. In mere differences of opinion between the Department and the Company on the matter of capital structure, the opinions of the Department are not solely by reason thereof entitled to prevail.

7. *Effect of Department's Use of Hypothetical 50% Debt Ratio on Cost of Capital Computation.* The manner in which the hypothetical 50% debt ratio entered into the Department's determination of the composite cost of capital is shown by the following computation contained in its decision:

|        | Ratio | Cost          | Weighted Cost (Ratio × Cost) |
|--------|-------|---------------|------------------------------|
| Debt   | 50%   | 5.7%          | 2.85%                        |
| Equity | 50%   | 9.5%–10.1%    | 4.75%–5.05%                  |
|        | Composite Cost of Capital |  | 7.60%–7.90%                  |

If the computation were made on the basis of a debt ratio of 45%, it would produce the following higher composite cost of capital:

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

|  | Ratio | Cost | Weighted Cost (Ratio × Cost) |
|---|---|---|---|
| Debt | 45% | 5.7% | 2.565% |
| Equity | 55% | 9.5%–10.1% | 5.225%–5.555% |
|  |  | Composite Cost of Capital | 7.79%–8.12% |

8. *Remand to Department.* Because of the Department's wrongful use of the hypothetical debt ratio of 50% with the resulting effect on the Company's cost of capital, and for other reasons appearing in later portions of this opinion, the case is remanded to the Department. As to the Company's debt ratio the Department is to make its decision on the basis of the Company's actual debt ratio and capital structure after giving effect to its issuance of long-term debt securities of $175,000,000 on September 1, 1970. The use of the Company's actual debt ratio will eliminate the issue of the propriety of the Department's use of assumed amounts for interest, income taxes and other taxes based on a hypothetical debt ratio.

RATE OF RETURN — COST OF CAPITAL.

1. *Cost of Debt Capital.* The Department found that the Company's "appropriate cost of debt for use in computing the overall capital cost is 5.7 percent." The Company contends, on the basis of evidence presented through its witnesses, that the correct cost of such capital was 5.8%.[18] If the difference between the two rates were due solely to matters of judgment or opinion, it might be difficult to hold that the Department's decision was not within a permitted range of reasonableness. However, there are three factors which entered into the Department's decision which we hold

---

[18] The effect of this difference of one-tenth of one per cent in rate when applied to the rate base of $894,531,000 found by the Department is illustrated by the following computations: (a) if the debt ratio used is 50%, the difference is $447,265.50 ($894,531,000 × 50% = $447,265,500 × .001 = $447,265.50), and (b) if the debt ratio used is 45%, the difference is $402,538.95 ($894,531,000 × 45% = $402,538,950 × .001 = $402,538.95).

require that this issue be remanded to it for further consideration and decision in accordance with the discussion which follows.

At the hearings before the Department the Company presented evidence that it anticipated the issuance of debt securities of $150,000,000 in September, 1970. Witnesses for both the Department and the Company testified that in their opinion the Company's cost of such new debt issue would be 8%. In its decision the Department used 8% as the expected cost of the proposed debt issue. Less than three months after the decision the Company issued debt securities for $175,000,000 and its actual cost therefore was 8.73%. It thus appears that the opinions of the witnesses on both sides were inaccurate. While the Department cannot be criticised for relying on the unanimous opinion of the witnesses that the anticipated debt issue would cost the Company 8%, "[i]t is now possible and proper for us . . . and for the . . . [Department], to examine and evaluate the current facts with the aid of 'the improved vision of intervening experience.'" *Boston Gas Co.* v. *Department of Pub. Util.* 359 Mass. 292, 299, and cases cited. In computing the Company's over-all cost of debt capital, the Department should now use the actual cost of 8.73% rather than the anticipated cost of 8% for the debt securities issued on September 1, 1970.

The witnesses on both sides agreed that the cost for the Company's long-term debt outstanding at the time of the hearings was 4.78%. The adjustment for the anticipated debt issue of $150,000,000 at 8% brought the cost for all long-term debt through that issue to 5.42%.[19] This was

---

[19] Using the same formula used by the witnesses and included in the Department's decision, but giving effect to the new debt of $175,000,000 at a cost of 8.73%, this figure would increase to 5.67%:

| Amount of Debt | Charges | Rate | Composite Cost |
|---|---|---|---|
| $610,000,000 existing debt | $29,200,000 | 4.78% | |
| $175,000,000 new debt | 15,277,500 | 8.73% | |
| $785,000,000 total debt | 44,477,500 | | 5.67%  (5.6659%) |

360 Mass. 443                                                        471

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

referred to by the witnesses and the Department as the "embedded cost" which was adjusted, for reasons not here material, to arrive at the "weighted composite cost of debt." Notwithstanding the apparent unanimity of opinion on that computation of 5.42%, the Department instead used as the Company's "embedded cost" of debt capital the "total embedded Bell System debt costs for all issues outstanding through April 15, 1970," which was 5.31%. It based this action in large part on "overall system financing considerations" which it had also applied to the Mystic Valley Gas Company. On appeal by the latter company we held that it was "entitled to have its rates computed on the actual cost of its outstanding long-term debt, and the reasonably-to-be expected current cost of its short-term debt and common equity, under substantially its own present capital structure, without hypothetical attribution to it of the . . . historic capital costs" of its parent corporation. *Mystic Valley Gas Co.* v. *Department of Pub. Util.* 359 Mass. 420, 432. The Company before us has a separate corporate existence from the parent holding company of the Bell System. The parent company owns about seventy-one per cent of the Company's stock and the remaining twenty-nine per cent is publicly owned. The Company's record and experience in the raising of long-term debt capital from sources other than the parent company is such that it is entitled to have its own historic cost of such capital used rather than that of the parent company.

The Company is also entitled to have its cost of debt capital determined on the basis of its actual debt ratio after giving effect to the new debt securities of $175,000,000 issued on September 1, 1970, and not on the basis of the hypothetical 50% debt ratio assumed by the Department.

2. *Cost of Equity Capital.* Of all the subsidiary decisions made by the Department in this case, the one having the greatest impact on the Company and its Massachusetts customers in dollar amount is that fixing the cost of the Company's equity capital. The Department decided that the cost is in the range of 9.5% to 10.1%, and the Company

contends that it is in the range of 11% to 11.5%. Assuming that 55% of the amount of the rate base found by the Department consists of equity capital, this difference of 1.5% separating the parties on the rate of return on equity capital would make a difference of about $7,379,880 in the Company's net earnings before income taxes. (Rate base of $894,531,000 × .55 equity = $491,992,050 × .015 = $7,379,880.) However, to realize an increase of this amount in its net earnings, the Company would require an increase of about twice as much in the gross revenues payable to it by customers. The reason for this is that Federal income taxes reduce the Company's pre-tax earnings by about 48% and State taxes reduce them by an additional lesser amount.

There is no disagreement between the parties as to what is meant by a fair rate of return on equity capital. In the words of this court it means " 'the amount which the company would have to pay in order to "hire" its equity capital under current conditions.' " *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 88. The briefs on both sides, and the decision of the Department cite and rely on the case of *Federal Power Commn.* v. *Hope Natural Gas Co.* 320 U. S. 591, where the court said (p. 603): "[T]he fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests . . . '[R]egulation does not insure that the business shall produce net revenues.' . . . But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. . . . By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital."

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

Expert witnesses for both the Company and the Department presented testimony and documentary exhibits on the subject of cost of capital. Their evidence included detailed information concerning the Company's capital structure, revenues, expenses, earnings and dividend payments for many years prior to the hearing, and the market price and performance of the Company's stock for the same years. It also included similar information concerning other utility companies and some industrial companies for the same years, as well as information concerning significant economic factors, particularly inflation. Each witness described the methods or approaches used by him in arriving at his judgment or opinion as to the fair rate of return for the Company's stock. No useful purpose would be served by reviewing the great volume of evidence upon which the experts based their opinions. However, the following tabulation, setting forth their ultimate judgments and the Department's own judgment thereon may prove helpful.

| Company Witnesses | Assumed Debt-Equity Ratio | Cost of Debt | Cost of Equity | Composite Cost, Debt and Equity |
|---|---|---|---|---|
| George A. Skinner | 40/60 | 5.8% | 10.1–12% | 8.4–9.5% |
| Robert S. Stich | 45.7/54.3 | 5.87% | 11–11.5% | 8.65–8.92% |
| Arthur L. Coburn, Jr. | 40/60 | 5.43%* | 11.5% | 9.07% |
| *Department Witness* | | | | |
| David A. Kosh | 50/50 | 5.7% | 9.5–10% | 7.60–7.85% |
| *Department Decision* | 50/50 | 5.7% | 9.5–10.1% | 7.60–7.09% |

* This witness testified that this is the cost of "debt as it stood at the end of 1969, including the short and the long-term debt."

After giving their opinions of cost of capital as set forth above, some of the witnesses qualified them somewhat in estimating the composite cost of debt and equity capital. The Company witness Skinner testified that "9% is the minimum rate upon which our revenue requirements should be set." The Company witness Stich testified that "the overall fair rate of return is in the range of 8½–9%." The Company witness Coburn "rounded down" his 9.07% com-

posite return to 9%. The Department witness Kosh testified that his recommendation for a fair rate of return was 7¾%. The Department ultimately decided that "[o]n balance, we believe a rate of return of 7.80% would be fair and appropriate under all of the circumstances." In making that decision it appears to have used 9.9% as the cost of the equity portion of the Company's capital.[20]

The determination of the cost of debt capital starts with a mathematical computation of actual costs, and the element of judgment applies only to the matter of adjustments required to be made to the actual costs by reason of such factors as variations in the debt and equity ratios and new debt capital requirements in the near future. By contrast, the determination of the cost of equity capital is, in the language of the Department, "in the last analysis . . . a matter of judgment, informed judgment certainly, but judgment nevertheless. It is a prediction as to the future based on evaluation of past experience. . . . [It] is not a mechanical exercise, nor is it an immutable number. There is a line below which we cannot go — the line of confiscation — but above this line there exists a range of rates within which, in the exercise of our judgment, we must find a rate appropriate under the circumstances." The question before us as to equity capital is whether the Department's ultimate decision fixing the fair rate of return thereon at 9.9% is above the line of confiscation. We hold that it is not.

It has become commonplace to expect that experts called to testify and to express opinions on facts sought to be established in adversary proceedings will express differing opinions, and that the differences will be in direct relation to

---

[20] The Department first concluded that the composite cost of both debt and equity capital was in the range of 7.60–7.90% on the basis of a computation using a 50% debt ratio, 5.7% as the cost of debt and a range of 9.5–10.1% as the cost of equity. The ultimate decision on 7.80% as the composite cost appears to result from the following computation:

|                        |       |        |        |
| ---------------------- | ----- | ------ | ------ |
| 50% debt capital at    | 5.7%  | equals | 2.85%  |
| 50% equity capital at  | 9.9%  | equals | 4.95%  |
| Composite cost of debt and equity capital: |  |  | 7.80%  |

360 Mass. 443                                                          475

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

the interests of the parties by whom they are called to testify. This is most often evident in opinions on the value of property taken by eminent domain, but it is not limited to those cases. To recognize such a situation is not to impugn the good faith or integrity of expert witnesses. However, a consideration of the interdependence of the cause advanced by the litigant and the opinion expressed by the expert witness of his choice cannot be ignored in considering the weight and value of the opinion. In the ordinary adversary trial the witnesses are called by the opposing parties, neither of whom is charged with the responsibility of deciding between the differing opinions of the experts or of finding facts on the basis thereof. What we have before us is not that situation. In this case the Department as the trier of the facts occupies the anomalous position of being able to call witnesses of its choice to testify concerning the very facts which it is required to find. The position is no less anomalous by reason of the fact it did not result from any fault of the Department but was created by applicable statutes. This anomaly is a significant factor in our decision of this case.

The Department's conclusion on the cost of debt capital and equity capital, and on the composite of both types of capital, are almost identical to the opinions expressed thereon by its witness Kosh. Kosh had been retained by the Department as its witness in at least two prior rate proceedings involving other utilities. See *Boston Gas Co.* v. *Department of Pub. Util.* 359 Mass. 292, 304. *Mystic Valley Gas Co.* v. *Department of Pub. Util.* 359 Mass. 420, 426. He has appeared as a witness in about twenty or thirty cases involving rate proceedings by a "Bell System Company." In all of those cases he appeared for a party other than the telephone company. In recent years his primary occupation has been that of a "professional witness" in utility rate proceedings. With very few exceptions his work has been performed in behalf of public utility regulatory agencies or commissions.

The Department rejected the opinions of the Company's three witnesses on the cost of equity capital. The witness Skinner has worked for the Company since 1937 and he is now its director of business research. The witness Stich is a professor of business administration at Boston University. Prior to his appearance as a witness in this case he had testified before a regulatory agency once for a Bell System telephone company in South Dakota, once for such a company in North Dakota, and once for the present Company in Rhode Island. He is the only witness who based his testimony and opinions on cost of capital on assumed ratios of 45.7% debt and 54.3% equity, thus giving direct effect to the Company's anticipated debt issue of $150,000,000 in September, 1970. Other witnesses considered the anticipated debt issue in various ways, but not directly in fixing the debt and equity ratios. The Company witness Coburn worked for The First National Bank of Boston, or subsidiaries or affiliates thereof, from 1925 until his retirement in 1968. He started as a security analyst and he was a vice-president at the time of his retirement. His principal activity in those capacities was in security and economic analysis and investment portfolio management. Since his retirement he has continued activity as a trustee and as a consultant on investments.

There is no doubt that the Department believed that the 7.8% composite rate of return which it fixed was within the range of reasonableness. There is likewise no doubt that the Department was "not persuaded that the Company should earn a return at the top of the range." It said so in its decision and gave three reasons therefor. One was "the failure of the Company to follow . . . [the] Department's judgment as to the appropriate debt ratio and the effect of this failure on interest charges which this Company will be obligated to pay." We have discussed this subject in an earlier portion of this decision. Another was the Company's "failure to elect liberalized depreciation under Section 167 of the Internal Revenue Code of 1954." On this

it commented further: "It is not possible to turn back the clock on this issue; it would be unfair to charge the Company with tax savings which it never realized." The third was that "the quality of service offered by the Company [in recent months] has deteriorated seriously." Although the Department intended to rely on these reasons only in justification of keeping the rate of return at the lower level of reasonableness, it is our opinion that the result was a rate of return below that lower level.

The company made a stock offering to its stockholders in September, 1969. The minority stockholders (being all stockholders other than the American Telephone and Telegraph Company) were offered a total of 1,166,781 shares. They subscribed to only 24% of that number. The new stock was offered at a price of $36 on a date when it was selling on the New York Stock Exchange at $39.50 to $39.75 a share. During the twenty day period in which rights to subscribe to the new shares could be exercised, the market price of stocks in general did not go down, but the market price of the Company's stock dropped to $36 and the rights were worthless. In the words of the Company's witness Coburn, the offer "failed dismally." Commenting on this offering in its decision, the Department stated: "The failure of the stockholders to exercise all their preëmptive rights may be evidence that the stock was not priced sufficiently below the market; it does not demonstrate that a larger percent or all of the rights would not have been exercised at a lower price." The failure of the offer might equally demonstrate that the investing public would not purchase the stock at the Company's level of earnings and dividends at that time and in the reasonably foreseeable future. The failure of the offering was an easily identifiable warning signal of stormy financing weather ahead for the Company.

In a case of this type, "[I]t is beyond our power to fix rates . . . yet it is our duty to draw to the best of our ability the line where confiscation begins, and . . . in

order to make our decision as useful as possible and not merely the starting point of a series of attempts to ascertain by the method of trial and error just what figure this court would allow to stand, it seems that we should state where in our judgment on the evidence before us that line must be drawn." *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 95. On all the evidence, it is our opinion that a return of nothing less than 11% on equity capital will be sufficient to attract new stock capital to the Company at its actual debt ratio of about 45%. This rate of 11% is the lowest level of the range of reasonableness for equity capital. "It does not follow that a considerably higher return might not fall within the range of reason and might not have been allowed by the department, but our duty is performed by marking the line of confiscation." *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 96.

3. *Composite Cost of Capital.* In earlier paragraphs of this opinion we have commented on the cost of debt capital in a manner which will require the Department to reconsider its decision that such cost is 5.7%. If the Department concludes upon reconsideration that 5.7% is the correct cost of debt capital, we hold that the lowest level of the range of reasonableness of the composite cost of capital is 8.615%, based on the following computation:

| | | | |
|---|---|---|---|
| 45% debt capital at | 5.7% | equals | 2.565% |
| 55% equity capital at | 11.0% | equals | 6.050% |
| Composite cost of debt and equity capital: | | | 8.615% |

If the Department shall conclude upon reconsideration that the correct cost of debt capital is a rate other than 5.7%, the composite cost of capital shall be computed in the above manner but with the use of the correct cost of debt capital.

4. *Return on Reinvested Surplus.* In *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 327 Mass. 81, 97, after full discussion and citation of authorities, we held that the

"rate of return the company is entitled to receive on reinvested surplus, which is neither debt capital nor stock capital, but has been derived from both kinds of capital . . . is the same as that established for the composite return on debt and stock capital." That rule was applied by us without reservation in *Wannacomet Water Co.* v. *Department of Pub. Util.* 346 Mass. 453, 466. The Department applied that rule in the present case. The Company contends that the policy of the rule is unwise, and asks us to examine our earlier decisions and to change the rule to provide that the Company is entitled to the same rate of return on its reinvested surplus as it is on its equity capital. The argument is not accompanied by any citations of judicial or other authority in support thereof. We are not convinced that we should change this rule.

## CONTESTED TEST YEAR EXPENSES.

The Department used the "test year" approach in determining the Company's revenue needs, starting with a consideration of the average rate base for 1969, and the actual revenues, cost of service and other expenses for that year. It then made such adjustments to these items as it deemed necessary to arrive at a proper basis for determining the revenues needed by the Company to enable it to earn a fair rate of return on the rate base. The Company contends that in this process the Department underestimated a number of the items of cost or expense with the result that its computations based thereon deprived the Company of revenue to which it was entitled. The several items allegedly underestimated are discussed in the following paragraphs.

1. *Taxes Affected by Capital Structure.* We have already held above that the Department must reconsider the Company's cost of capital by reference to its actual capital structure after the issuance of new debt securities on September 1, 1970, and not on the basis of the higher hypothetical debt ratio of 50%. This will reduce the amount of interest which the Department assumed would be payable on the

50% debt, and will result in an increase in the Federal income taxes and perhaps other taxes. To this extent the Department underestimated such taxes and must reconsider them in a manner consistent with this opinion.

2. *Federal Income Taxes.* During the test year 1969 the Company was subject to Federal income taxes at the basic rate of 48% of taxable income. In addition thereto it was subject to Federal surtax at the rate of 10% of the income tax, making the total effective Federal income tax and surtax rate 52.8% for the calendar and test year 1969. By the Tax Reform Act of 1969 the 10% surtax was repealed effective at the end of that year, but a 5% surtax was imposed for the six month period ending June 30, 1970. Int. Rev. Code of 1954, § 51 (a), inserted by 82 Stat. 251, 252, as amended, 83 Stat. 91, 93, as further amended, 83 Stat. 487, 657. This in effect subjected the Company, which was on a calendar year basis, to a surtax at the rate of 2½% for the year 1970, and to an effective Federal income tax and surtax rate of 49.2% (.48 × .025 = .012. .48 + .012 = .492) for the year. The Company contends that its Federal income tax expense for test year purposes should have been computed at the 49.2% rate. The Department instead used a tax rate of 48% and in doing so it said, in its decision of June 10, 1970, that "the surcharge will be eliminated as of June 30, and the tariff to be allowed as a result of this order will not have taken effect by that time." [21]

In determining the Company's appropriate test year Federal income taxes, the Department was entitled to consider the fact that they would be reduced in the years after 1969 because of the elimination of the surtax. The problem here is that although the surtax would not be totally eliminated until 1971, the Department acted on the basis that it would not be an expense item for any part of the year 1970 when in fact it was. The Company is entitled to reconsideration of this item. The amount and nature of any adjust-

---

[21] The new rates authorized by the Department's order of June 10, 1970, were issued by the Company on June 19, 1970, for effect on July 10, 1970.

360 Mass. 443                                          481

New England Telephone & Telegraph Co. v. Department of Public Utilities.

ment are to be determined by the Department on reconsideration of the case.

3. *Social Security Taxes.* There was undisputed evidence that the rate of the Social Security taxes payable by the Company would increase from the 4.8% in effect in 1969 to 5.2% on January 1, 1971. The Company estimates that the effect of this change will be to increase its Social Security taxes by about $380,000 a year. The Department appears to have made no allowance for this in its test year computations. This increase was foreseeable at the time of the Department's decision, and was to take effect slightly more than six months after the decision. On remand, the Department shall determine and consider the amount of such increase in its test year computations.

4. *Municipal Taxes.* In computing the test year expenses for municipal property taxes, the Department considered the annual increases in the rates of such taxes for the years 1967 through 1969. It then accepted the Company's assumption "that 1970 rates will be higher by the increased percentages that characterize the trend in 1967 through 1969," and on the basis thereof it adjusted the test year expense for such taxes upward by $1,862,000. The Company contends that this adjustment was inadequate.

After estimating the 1970 municipal tax rates in the manner described above, the Department applied the estimated rates to the real estate and personal property in service and assessed to the Company as of January 1, 1969. This failed to make any allowance in estimated test year expenses for municipal taxes on new plant coming into service during the test year. In the similar situation in *Mystic Valley Gas Co. v. Department of Pub. Util.* 359 Mass. 420, 436, we said: "The . . . [Department] in its decision gives no satisfactory reason for not applying the 1969 tax rate to at least the 1968 average plant valuation (used for the rate base) in determining test year local tax expense, instead of making its tax *rate* adjustment by applying the 1969 rate apparently only to the amount of plant actually in being and assessed as of January 1, 1968." That observa-

tion applies equally to the present case. On remand the municipal property taxes for the test year are to be computed by applying the estimated 1970 tax rates to the average of the January 1, 1969, and January 1, 1970, assessments on the real estate and personal property in service.

A portion of the Department's brief is devoted to an argument in support of its refusal to include taxes on plant coming into service after January 1, 1970, in computing test year expenses. If that was an issue before the Department, it does not appear to have been argued by the Company in its brief in this court. Therefore, we do not deal with it.

5. *Advertising Expenses.* The Company spent about $800,000 for advertising its intrastate business in 1969. In its decision the Department said: "[A] substantial portion of the Company's advertising expenses represents what may be called 'institutional' advertising designed to improve the image of the Company, rather than to inform customers of new service or of other information which might be helpful or economical. To the extent that advertising expenses help customers, they are a proper part of the cost of service. To the extent, however, that they relate to attempts to improve the climate of public opinion toward the Company, or to explain why service is not as good as it has been, the cost of the advertising should be borne by the stockholders." The Department thereupon found "that $300,000 of advertising expense is not a proper cost of service." We hold that such action was error.

The Company spent $800,000 for advertising its intrastate business in 1969, which amount represented slightly more than two-tenths of one per cent of its $390,068,000 in revenues for that year. ($800,000 divided by $390,068,000 equals .00205.) There is no finding by the Department that the total amount spent for advertising is more than reasonably necessary. As a business corporation engaged in selling an important service, the Company is entitled to take all reasonable means to promote and to seek to enlarge that business. One of the means used by almost all business

corporations is advertising. The Company is entitled to expend reasonable sums in an effort to retain its current customers, to acquire additional customers, and to sell to all such customers as many of its services as it has available for sale. It is no less entitled to advertise by reason of the fact that it is a regulated public utility than is the ordinary business corporation. The type and quantity of such advertising, and the means, media or vehicle used therefor are matters to be decided originally by the duly authorized managers of the Company's business. They must make the decision whether institutional type advertising is helpful to its business, and if so the amount to be expended therefor. The Company is not limited·to expenditures for advertising designed "to inform customers of new service or of other information which might be helpful or economical," as apparently limited by the Department.

In *West Ohio Gas Co.* v. *Public Util. Commn. of Ohio* (No. 1), 294 U. S. 63, 72, in speaking of the regulatory agency's disallowance of advertising expenses, the Supreme Court of the United States said: "The criticism [by the Commission] has no basis in evidence, either direct or circumstantial. Good faith is to be presumed on the part of the managers of a business. . . . In the absence of a showing of inefficiency or improvidence, a court will not substitute its judgment for theirs as to the measure of a prudent outlay. . . . A business never stands still. It either grows or decays. Within the limits of reason, advertising or development expenses to foster normal growth are legitimate charges upon income for rate purposes as for others. . . . When a business disintegrates, there is damage to the stockholders, but damage also to the customers in the cost or quality of service." This language was quoted with approval in *Central Maine Power Co.* v. *Public Util. Commn.* 153 Maine, 228, 243–244. Similarly, in *Petition of New England Tel. & Tel. Co.* 115 Vt. 494, 510–511, the court said: "The function of a public service commission is that of control and not of management, and regulation should not obtrude itself into the place of management. . . . This

matter of salaries and advertising expense calls for the exercise of judgment on the part of the management of the company. Good faith on its part is to be presumed. Although these expenses should be scrutinized with care by the commission they should not be disallowed or reduced unless it clearly appears that they are excessive or unwarranted or incurred in bad faith."

In *Re Consolidated Edison Co. of N. Y. Inc.* 41 P. U. R. 3d 305 (N. Y. Pub. Serv. Commn.), the Commission held that expenditures for institutional advertising were a proper expense for rate-making purposes. The decision said (364–365): "What is of concern here are advertisements which are obviously designed to project a favorable image of the company to its customers, its existing stockholders or potential investors. To the extent that such advertising fosters sound consumer relations or encourages people to invest in the company, it seems clear that the consumers, as well as the stockholders, are ultimately benefited through the lessening of the expense of doing business. . . . [T]he trend in modern regulatory decisions is to allow such charges as proper for rate-making purposes. . . . In conclusion, it is determined that in view of the fact management should control advertising expenditures as long as they are within the limits of reason, and so long as these expenses do not exceed what is reasonably necessary and proper in the particular case . . . there is no ground to distinguish such costs from other necessary and proper expenses." In 1968 that Commission quoted much of this language in reaching the same result in *Re Consolidated Edison Co. of N. Y. Inc.* 73 P. U. R. 3d 417, 469 (N. Y. Pub. Serv. Commn.).

We conclude that the Department's disallowance of $300,000 of expenditures for advertising on the grounds stated by it is an unwarranted interference with the function and prerogative of the Company's business managers and that it is therefore beyond the power and authority of the Department. On remand the test year computations are to be made without deduction of such amount.

6. *Charitable Contributions.* In 1969 the Company con-

360 Mass. 443                                                                   485

New England Telephone & Telegraph Co. *v*. Department of Public Utilities.

tributed a total of $348,000 to various charities. The Department found that $258,000 of this amount was attributable to the Massachusetts intrastate operations and it disallowed this sum as an item of cost of service.[22] In doing so the Department said: "We believe that this Company has responsibilities to the community which it serves. We applaud its recognition of this responsibility in the form of its charitable contributions, but it is not proper that the customers bear the cost of these contributions by the inclusion of them in the cost of service. It is more properly a burden which should fall on the stockholders." We hold that this action by the Department was error.

The Company's policy on charitable contributions is determined by its board of directors. The recipients are usually institutions or organizations which either enjoy a broad base of public support in a community served by the Company or whose activities or program are related to the community at large or to a substantial segment of the community. Typical of the recipients are United Fund combined drives, general hospital campaigns, the Red Cross, Cancer Fund and similar charities. Some authority is delegated to the Company's local managers and other employees in authority to select recipients for lesser contributions to local charities. The Company's annual contributions to charities are not fixed at a percentage of its revenues or profit, but are determined in each year by its board of directors.

An examination of a number of the Department's decisions shows no established pattern in its treatment of charitable contributions in rate-making proceedings. In 1949 it disallowed the Company's charitable contributions as an operating expense. *Re New England Tel. & Tel. Co.* 83 P. U. R. (N. S.) 238, 340 (Mass. Dept. of Pub. Util.). Four subsequent decisions by the Department on the Company's rates are silent on the subject of charitable contributions. *Re*

---

[22] The Company points out in its brief that its "charitable contributions for the past year . . . [represent] .07 of 1% of operating revenue," and contends that they are "modest in amount."

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

*New England Tel. & Tel. Co.* 2 P. U. R. 3d 464, 2 P. U. R. 3d 501, 7 P. U. R. 3d 572, and 22 P. U. R. 3d 470 (Mass. Dept. of Pub. Util.). The Company cites the same four decisions as instances where the "Department itself has followed that more modern and enlightened trend in not disallowing charitable contributions in any of the Company's rate matters which have come before it since the 1949 case."

There are numerous regulatory agency and judicial decisions holding that charitable contributions by a regulated public utility are not deductible as operating expenses for rate-making purposes.[23] Most of these decisions appear to rely on the ground that the contributions produce no benefits accruing to the utility company, or that they represent a form of compulsory or involuntary levy by the utility upon its customers for a contribution to charities selected by the utility.[24] A majority of the earlier decisions of regulatory agencies in States where there were no statutory or judicial requirements to the contrary excluded such contributions as operating expenses for rate-making purposes.[25] However, the trend of the more recent agency decisions and of the majority of judicial opinions on the subject supports the rule that such contributions are a proper operating expense if reasonable in amount.

In 1959 the Illinois Commerce Commission, in *Vrtjak v. Illinois Bell Tel. Co.* 32 P. U. R. 3d 385, 387–388, said:

[23] Writing in 1970, Professor Phillip I. Blumberg notes that "[a] vigorous and substantial minority continues to disallow [charitable contributions as an expense] in the absence of demonstration of direct benefit." He then cites the numerous opinions to that effect. Blumberg, Corporate Responsibility and the Social Crisis, 50 B. U. L. Rev. 157, 181–182, and nn. 149–150.

[24] The following are some of the judicial opinions to this effect: *Denver Union Stock Yard Co.* v. *United States,* 304 U. S. 470, 482. *Reno Power, Light & Water Co.* v. *Public Serv. Commn. of Nev.* 298 Fed. 790, 801 (D. Nev.). *Idaho Power Co.* v. *Thompson,* 19 F. 2d 547, 580, 588 (S. D. Idaho). *Pacific Tel. & Tel. Co.* v. *Pub. Util. Commn. of Cal.* 62 Cal. 2d 634, 668–669. *Chesapeake & Potomac Tel. Co. of Md.* v. *Public Serv. Commn. of Md.* 230 Md. 395, 414. See *Central Maine Power Co.* v. *Public Util. Commn.* 153 Maine, 228, 234.

[25] For a collection of citations of such decisions, see Blumberg, Corporate Responsibility and the Social Crisis, *supra,* at p. 182, n. 150,

360 Mass. 443                                                     487

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

"Support of philanthropic endeavor has finally achieved nearly universal acceptance by the public and by the law as a proper realm of corporate activity. From the early view that philanthropic contributions generally were improper and ultra vires (e.g., *Davis* v. *Old Colony R. Co.* [1881] 131 Mass. 258), the common law has come to recognize such contributions not only as legitimate expenses of business but as the discharge of an obligation. . . . It seems to us that the current trend of decisions recognizing utility contributions as proper operating expenses is not only in keeping with sound thinking as to corporate responsibility but is also realistic in terms of the advantages thereby derived by the contributing utility." [26]

In 1964 the Federal Power Commission, in *United Gas Pipe Line Co.* 31 F. P. C. 1180, 1189, approved charitable contributions as a proper operating expense, and in doing so said: "We believe that contributions of a reasonable amount to recognized and appropriate charitable institutions consti-

---

[25] This gradual evolution in the common law has been paralleled by a similar evolution in the statutory law of most jurisdictions. Professor Blumberg reports that, as of 1970, forty-eight out of fifty States had enacted some form of statutory authorization empowering business corporations to make specified charitable contributions. Blumberg, *supra*, at p. 192, and Appendix, pp. 208–210. The Company is a New York corporation and is classified under New York law as a "transportation corporation," subject to the provisions of that State's Transportation Corporations Law, § 2 (2), McKinney: Consolidated Laws of N. Y. Anno. (1943). In addition, transportation corporations are subject to the provisions of the New York Business Corporation Law to the extent that its provisions do not conflict with the provisions of the Transportation Corporations Law, § 4 (McKinney 1970–1971 Supp.) (added by Laws 1964, c. 734, § 4, effective June 1, 1964). The Business Corporation Law contains the following provision: "Each corporation, subject to any limitations provided in this chapter or any other statute of this state or its certificate of incorporation, shall have power in furtherance of its corporate purposes: . . . (12) To make donations, irrespective of corporate benefit, for the public welfare or for community fund, hospital, charitable, educational, scientific, civic or similar purposes . . . ." N. Y. Business Corporation Law, § 202 (a) (12) (McKinney 1963). Since there are no provisions in the Transportation Corporations Law which would conflict with this power, the Company is by statute authorized under New York law to make charitable contributions. Given both the fact of this authorization in its home State and the fact that the Company would be similarly authorized under G. L. c. 155, § 12C, if it were organized in Massachusetts, there would appear to be a statutory basis for its power to make charitable contributions in Massachusetts. Cf. *Insurance Co. of No. America* v. *Commissioner of Ins.* 327 Mass. 745, 756.

tute a proper operating expense.[27]  Corporations have an
obligation to the communities in which they are located and
they are expected to recognize this obligation.  It is our
opinion that these contributions have an important relation-
ship to the necessary costs of doing business." In the recent
case of *El Paso Natural Gas Co.* 46 F. P. C. 454, 467, that
Commission rejected a request that it reverse the holding
quoted above and stated: "Reasonable charitable contribu-
tions are very much an obligation of a business enterprise to
the community it serves and upon which it is dependent for
its revenues.  To ignore a commitment to the general welfare
would be unthinkable and very much in contradiction to the
spirit of the times.  This is particularly applicable to a
regulated enterprise whose identification with the public
interest is instinctive in the legislation which gives rise to its
regulation."

In 1970, the New York Public Service Commission,
after noting the *Vrtjak* decision and quoting from the
*United Gas Pipe Line Co.* decision, said in *Re New York
Tel. Co.* 84 P. U. R. 3d 321, 349–350, reopening ordered on
other grounds, *New York Tel. Co.* v. *Public Serv. Commn.*
29 N. Y. 2d 164: "We believe it is time that this commission
reconsidered its past position with regard to charitable
contributions by utilities and, on such reconsideration, we
conclude that the contributions made by . . . [the New
York Telephone Company] and reflected in this proceeding
should be allowed as a proper operating expense."

The trend demonstrated by the regulatory agency deci-
sions discussed above is also evident in judicial decisions on
the subject.  *In the Matter of Diamond State Tel. Co.* 51 Del.
525, 536–537.  *Miami* v. *Florida Pub. Serv. Commn.* 208 So.
2d 249, 258–259 (Fla.).  *Southwestern Bell Tel. Co.* v. *State
Corp. Commn.* 192 Kans. 39, 73.  *United Gas Corp.* v. *Missis-
sippi Pub. Serv. Commn.* 240 Miss. 405, 434–435.  *Public*

---

[27] At this point in its decision the Commission said in a footnote: "As a
maximum we would allow contributions to those organizations included in
the Cumulative List, Organizations described in Section 170 (c) of the In-
ternal Revenue Code."  31 F. P. C. at 1189, n. 9.

360 Mass. 443                    489

New England Telephone & Telegraph Co. v. Department of Public Utilities.

*Serv. Co. v. State*, 102 N. H. 150, 160–161. *Northern States Power Co. v. Board of R.R. Commrs.* 71 N. D. 1, 22. Thus, by 1965, in *United Transit Co. v. Nunes*, 99 R. I. 501, 513–514, the Supreme Court of Rhode Island noted this trend and concluded: "In our opinion, . . . the better and apparently the majority rule is that a gift by a public utility to a charitable organization in modest amount may be charged as an operating expense provided it is first established that it is productive of good community relations which will benefit the utility or its patrons."

Upon consideration of all of the authorities cited and discussed above, we hold that a regulated public utility company may properly expend reasonable amounts for charitable purposes and that such expenditures qualify as operating expenses of the company for rate-making purposes. We do not feel compelled to assume or decide whether such expenditures are in furtherance of the Company's social responsibility to the community from which it derives its revenues, or whether they are in furtherance of the Company's own purposes in the promotion of better public relations, good will or community acceptance. Perhaps the most direct and forthright, and therefore the best statement of the justification for recognizing such expenditures as operating expenses appears in *Re Public Serv. Co. of N. H.* 27 P. U. R. 3d 113, 125, where the New Hampshire Public Service Commission said: "Such contributions are vital to establish and improve public relations. It is considered much the same as advertising."

As in the matter of advertising, the authority for deciding how much to expend for charity, and the manner in which to spend such amount, rests with the managers of the Company's business. There is no finding by the Department that the amount thus spent is unreasonable, or that there was any impropriety in the selection of beneficiaries of the charitable expenditures. The Department recognized the right and power of the Company to make such contributions, but it interpreted the law as not permitting them to be treated as operating expenses for rate-

490                                    360 Mass. 443

New England Telephone & Telegraph Co. v. Department of Public Utilities.

making purposes. In this regard the Department was in error. On remand the test year computations of operating expenses are to include those charitable contributions which the Department excluded.

7. *Wage Increases.* The Company granted wage increases to its employees in each of the years 1969 and 1970. For test year purposes the Department adjusted the Company's actual 1969 wage expense by giving effect to the 1969 increase on a full year basis, but it refused a further adjustment for the 1970 increase. In its decision the Department said: "Although our discussion indicates that we believe a test year adjustment of the full effect of the 1969 wage increase is not justified by the Company's evidence (if indeed any adjustment is appropriate for this change), we have considered the fact that the Department's own witness made this allowance in his testimony. In particular, it provides a margin of safety which offsets the possibility that other evidence could have been offered by the Company regarding the propriety of adjustment for a portion of the 1970 wage increase."

The principal reason given by the Department for refusing to adjust for the 1970 wage increase is that notwithstanding wage increases in all but one of the years from 1958 through 1969, the Company increased its earnings in each year of that period. The Department stated in its decision that "[t]o demonstrate the propriety of an adjustment for the 1969 wage increase, the Company would have had to demonstrate that the amount of the increase was greater than the amount that would normally have been offset by changes in revenues or other expenses." This statement appears to have formed the basis for the Department's refusal to adjust for the 1970 wage increase. The statement is tantamount to a ruling that (a) the Company may only recoup the amount of a wage increase, and (b) the Company is not entitled to relief by reason of a wage increase if, notwithstanding the wage increase, it has some increase in its net earnings. Such a proposition is untenable because it disregards the relationship of the Company's

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

annual increase in earnings to the annual increases in plant investment. The annual increases in wages, earnings and plant investment are shown in the footnote below.[28]

The Company's increases in net earnings in relation to its increased investment in plant have not been sufficient to both (a) recoup the wage increases and (b) permit a fair return on the ever increasing plant investment. The corollary decline in the Company's rate of return on its increasing investment during the last five years is demonstrated by the following figures taken from one of its exhibits:

|  | *1964* | *1969* | *Increase* |
|---|---|---|---|
| 1. Net Plant Investment | $687,176,000 | $1,006,237,000 | $319,061,000 |
| 2. Net Earnings | 50,514,000 | 62,605,000 | 12,091,000 |
| 3. % of Earnings to Investment (line 2 divided by line 1.) | 7.35% | 6.22% | 3.79% |

The Company cannot be required to forego a fair return on its increased investment before obtaining relief based on increased expenses, whether for wages or other items. On

[28]

|  | 1. | 2. COMBINED OPERATIONS | 3. | 4. MASSACHUSETTS OPERATIONS | 5. |
|---|---|---|---|---|---|
| *Year* | | *Wage Increase* | *Net Earnings Increase* | *End of Year Investment* | *Increase in End of Year Investment from Prior Year* |
| 1958 | | $ 985,000 | $9,553,000 | $ 448,001,000 | |
| 1959 | | 1,701,000 | 5,061,000 | 485,261,000 | $37,260,000 |
| 1960 | | 1,710,000 | 4,568,000 | 520,587,000 | 35,326,000 |
| 1961 | | 1,222,000 | 2,249,000 | 555,210,000 | 34,623,000 |
| 1962 | | 1,350,000 | 3,645,000 | 544,198,000 | 38,488,000 |
| 1963 | | 2,338,000 | 3,753,000 | 634,137,000 | 39,939,000 |
| 1964 | | 1,622,000 | 4,354,000 | 687,176,000 | 53,039,000 |
| 1965 | | 1,987,000 | 5,489,000 | 746,826,000 | 59,650,000 |
| 1966 | | 3,577,000 | 6,225,000 | 804,991,000 | 58,165,000 |
| 1967 | | None | 5,255,000 | 870,977,000 | 65,986,000 |
| 1968 | | 4,073,000 | 1,819,000 | 908,661,000 | 37,684,000 |
| 1969 | | 4,633,000 | 2,761,000 | 1,006,237,000 | 97,576,000 |

(The figures in column 2 above are described by the Department in its decision as "Indicated Annualized Decrease in Net Earnings due to Wage Increase." The figures in column 4 are taken from the Company's exhibits, and while they may approximate the "rate base" for the years in question, they are not represented to be the amount of the rate base.)

remand of this case the Department is to determine, upon a consideration of all the evidence, whether the 1970 wage increases should be included in the test year expenses. These wage increases are not to be excluded solely because the Company increased its net earnings in spite of them.

8. *Maintenance Expenses.* The Department held that for test year purposes the Company's "maintenance expense[s] should be reduced by $3,000,000 [from the amount actually expended therefor in 1969] to reflect the fact that maintenance expenses, if not adjusted, would be distorted by the effect of the 1968 strike and possibly by unusual storm damage in 1969." Notwithstanding the reference to "storm damage," it is clear from the subsidiary findings that the Department's reduction in the maintenance item was based entirely on its conclusion that the actual expenses for 1969 were abnormally high because they covered maintenance work deferred from 1968 because of a strike in that year. About 7,500 of the Company's plant employees were out on strike during a four-month period in 1968. The percentage of plant employees who remained at work ranged from 19.6% at the early part of the strike to not more than 34% later in the strike. The Company contends that routine maintenance work was performed by management personnel during the strike, and that "after the strike — through increased employees and overtime work — much maintenance not performed during the strike was performed during the latter part of 1968." The Company concedes that "some maintenance work that would have been performed in 1968 was delayed until 1969 because of the strike [but that this work] . . . was the portion of certain construction work that is normally charged as a maintenance expense."

There appears to be no disagreement between the parties on the general rule that an abnormal, nonrecurring item of expense should not be included in test year expenses for rate-making purposes. *Central Maine Power Co. v. Public Util. Commn.* 156 Maine, 295, 337–338. *Re New Jersey Bell Tel. Co.* 78 P. U. R. (N. S.) 97, 110–111 (N. J. Bd. of Pub. Util. Commrs.). *Re Kentucky Util. Co.* 22 P. U. R. 3d 113,

117 (Ky. Pub. Serv. Commn.). *Butler* v. *Butler Water Co.* 32 P. U. R. 3d 113, 120 (Pa. Pub. Util. Commn.). *Re A–J Indus. Inc.* 62 P. U. R. 3d 113, 120–121 (Alaska Pub. Serv. Commn.). Likewise, there appears to be no disagreement on the application of the general rule in a manner which will exclude from test year expenses the cost of plant maintenance which would normally have been performed in earlier years but which was deferred to the test year. *Re New England Tel. & Tel. Co.* 83 P. U. R. (N. S.) 414, 436–437 (Vt. Pub. Serv. Commn.), revd. on other grounds, *Petitions of New England Tel. & Tel. Co.* 116 Vt. 480. *Pennsylvania Pub. Util. Commn.* v. *Philadelphia Transp. Co.* 90 P. U. R. (N. S.) 203, 213–214. *Mississippi Pub. Serv. Commn.* v. *Southern Bell Tel. & Tel. Co.* 16 P. U. R. 3d 415, 458 (Miss. Pub. Serv. Commn.) (involving maintenance deferred because of a strike by employees). *Re Puerto Rico Tel. Co.* 55 P. U. R. 3d 1, 20 (Puerto Rico Pub. Serv. Commn.). See *Pennsylvania Pub. Util. Commn.* v. *York Tel. & Tel. Co.* 53 P. U. R. 3d 146, 184.

The issue on which the parties are in disagreement is whether the amount spent by the Company for maintenance in 1969 included any maintenance which had been deferred from 1968 because of the strike. This is an issue of fact on which the Company has the burden of proof. *Central Maine Power Co.* v. *Public Util. Commn.* 156 Maine, 295, 338. The evidence on this issue included oral testimony and exhibits of witnesses of both the Company and the Department, and while it was sufficient to warrant a finding for the Company on the issue it did not preclude a finding to the contrary. The preliminary decisions on the credibility and weight of the evidence are the responsibility of the Department and it decided in effect that the Company did not sustain its burden of proof. We do not substitute our judgment for that of the Department thereon. *Martin* v. *Director of the Div. of Employment Security*, 347 Mass. 264, 268–269. The Company argues that its actual 1969 maintenance expenses "are presumed to be reasonable in the absence of proof akin to

494                                         360 Mass. 443

New England Telephone & Telegraph Co. *v.* Department of Public Utilities.

that required to show bad faith," citing *Missouri ex rel. Southwestern Bell Tel. Co.* v. *Public Serv. Commn. of Mo.* 262 U. S. 276, 289. The "mere actuality of expense does not establish its 'reasonableness . . . propriety or necessity.'" *New England Tel. & Tel. Co.* v. *New Hampshire*, 95 N. H. 353, 363. If this is an attempt to shift the burden of proof to the Department, we do not agree with it. In any event, it is not enough that the expenses were reasonable. They may be reasonable and still be abnormal and nonrecurring and therefore subject to exclusion in test year computations. Emergency repairs for storm or casualty damage can be both reasonable and necessary and yet the expense of making the repairs may so distort the total amount of the item of maintenance expense for the year as to require an adjustment downward for test year purposes. The same is true of expenses for maintenance deferred from prior years to the test year.

Although we hold that there was no error by the Department in its decision on the item of test year maintenance expenses, the case is to be remanded to the Department for other reasons. When the Department rendered its decision on June 10, 1970, it was required to estimate future maintenance expenses "through the dim lenses of prophecy." However, since the decision is now challenged on constitutional grounds, "our observations must be undertaken with the improved vision of intervening experience." *Lowell Gas Co.* v. *Department of Pub. Util.* 324 Mass. 80, 89, cert. den. 338 U. S. 825. The Department now has available to it evidence regarding the Company's actual maintenance expenses for the year 1970 and a portion of 1971. It should, therefore, after receiving and verifying such additional evidence, review and reconsider its estimate of test year maintenance expenses on the basis thereof. *Boston Gas Co.* v. *Department of Pub. Util.* 359 Mass. 292, 299–300.

CONCLUSION.

1. We have stated above that the case is to be remanded to the Department for reconsideration and further action consistent with this opinion on the subjects of the Company's capital structure — specifically its debt and equity ratios, the rate of return on its capital, and the determination of certain of its test year expenses. As part of such reconsideration the Department will have the opportunity to determine the Company's actual operating results since the original hearing and to compare such results with the opinions, predictions and hopes which entered into the decision of June 10, 1970. "The law is well-settled that the . . . [Department] may not rely on a reckoning when actual experience is available and establishes that the predictions have been substantially incorrect." *New York Tel. Co.* v. *Public Serv. Commn. of the State of N. Y.* 29 N.Y. 2d 164, 169. *Lindheimer* v. *Illinois Bell Tel. Co.* 292 U. S. 151, 164. *People ex rel. Consol. Water Co. of Utica* v. *Maltbie,* 275 N. Y. 357, 367–368, app. dism. 303 U. S. 158.

2. The case is remanded to the county court. An order is to be entered there directing (a) further consideration and decision by the Department in the light of this opinion, and (b) a further report of its action thereon by the Department to the county court. The stay heretofore granted is to remain in effect until further order of the county court.

*So ordered.*