## In re TELEPHONE COMPANY PROMOTIONAL PRACTICES.

Docket No. 73155-TP.    Order No. 6352.

Florida Public Service Commission.

November 22, 1974.

Chairman WILLIAM H. BEVIS, Commissioners WILLIAM T. MAYO and PAULA F. HAWKINS participated in the disposition of this matter.

BY THE COMMISSION.

Pursuant to notice, the commission held a public hearing in this matter on January 10, 1974 in Tallahassee. After considering the entire record herein, the commission now enters its order in the premises.

### Background

By Order No. 5680, dated March 19, 1973, we instituted a general investigation of promotional practices by telephone companies and directed each company to submit appropriate responses fully disclosing their respective advertising and promotional practices as well as detailed information describing the basic reasons for such practices and justification for consideration of such expenses for ratemaking purposes.

At that time, we had pending before us similar investigations of the electric and gas industries and we recognized that promotional practices were not peculiar to those industries alone for promotional practices of some form or another have been engaged in by practically all of the telephone companies. Because some expenditures clearly are not in the best interests of the ratepayer, and serve to foster ill will in the minds of the subscribers, this investigation was

initiated to determine which, if any, practices by the companies should be disallowed for ratemaking purposes. Responses have been filed on behalf of 15 companies, a number of which also requested that public hearings be held in order to give them an opportunity to present evidence on the issues raised herein. This request was granted by Order No. 5946, dated December 4, 1973, and the matter was set for public hearing on January 10, 1974, in Tallahassee. At that time, six telephone companies took advantage of the opportunity to present evidence, to wit — Florida Central Telephone Company, Central Telephone Company of Florida (then known as Southeastern Telephone Company), Southern Bell Telephone and Telegraph Company, United Telephone Company of Florida, North Florida Telephone Company and General Telephone Company of Florida. Additionally, Order No. 5946, *supra,* provided that in the event a company did not wish to participate in the public hearings, its response would be made a part of this record and considered in the disposition of this matter. All parties, then, have been given an opportunity to present evidence on the issues herein and to justify their respective positions in this matter.

## The parties

We have before us to aid us in the resolution of this docket the responses of 15 companies on the issues herein as well as supplemental testimony by six of the companies. Further, three parties were authorized to intervene although only one actively participated in the hearing. They include the Florida Press Association (Order No. 5988), the Attorney General (Order No. 5734), and the Florida Association of Broadcasters (Order No. 5935). A summarization of the respective positions of each of the parties will be helpful in framing the issues and in reaching our decision.

### 1. *Florida Press Association (FPA)*

This party did not actively participate in the proceeding but did file a brief statement setting forth its views. The FPA believes that a company's advertising should be determined by management and that promotional advertising of special services allows the base rates for telephone service to remain low. Finally, it emphasizes the point that the newspapers of Florida firmly believe in the right and freedom to advertise. It opposes, then, any order which would impede the right of utilities to continue to advertise.

### 2. *Florida Association of Broadcasters*

This organization did not actively participate in the proceeding nor did it file a response setting forth its position. Thus, its intervention does not affect the outcome of this proceeding.

### 3. *Attorney General*

The Attorney General formally intervened on behalf of the state of Florida as a consumer of telephone services. His position was set forth during the hearing by statement of counsel that absent a direct, clear and convincing showing of benefits to the ratepayers, the commission should not allow any expenditures for advertising purposes to be treated as operating expenses.

### 4. *St. Joseph Telephone and Telegraph Compay*

This company's total expenditures in 1972 for advertising was approximately $4,500 and fell into two categories — (1) advertising by radio and newspaper media to promote the use of telephone services such as extension instruments and DDD calling, and to inform the public of rate changes and directory closing dates, (2) institutional advertising which encompasses advertising in various local publications. The latter advertising is for the purpose of "having as much local identification as possible".

### 5. *Indiantown Telephone System, Inc.*

In its response dated April 19, 1973, this company reflected total advertising expenditures in 1972 of $402.85, which included expenditures for sponsorship of local community events and the like. It also periodically uses bill stuffers to promote different products and services available to the customers. The company justifies its present advertising program on the grounds that as one of the larger and more vital businesses in the community it must participate in community oriented activities in order to maintain community interest as well as create goodwill in the minds of the public.

### 6. *Orange City Telephone Company*

By its response, Orange City Telephone Company indicates that it incurred advertising costs of $119 in 1972, which it considers a typical year, and this amount represented only 0.03% of total company operating expenses of $421,839. Its present policy is to utilize advertising for the purpose of providing instruction to and acquainting its customers in the effective and proper operation of telephone facilities and services provided; to acquaint the public as to the availability of new and improved services, to increase operating revenues through effective promotional programs; and to present the company as a good citizen in the community in which it serves. It has attempted to demonstrate the effectiveness of its advertising program by the increase in extension telephones of its customers in 1972. This, points out the company, has resulted in keeping down the price of basic telephone service.

### 7. *Winter Park Telephone Company*

During 1972, this company had total advertising costs of $38,464 (A/C 642) which represented about .43% of total operating expenses. Basically, its advertising consists of utilizing the newspaper, magazine and radio media, as well as bill stuffers, public displays, truck posters, and yellow page advertising. It points out that due to an intensive sales effort, it added almost 5,000 extension telephones in 1972. Its efforts also resulted in spreading its peak load on available equipment to off peak hours which resulted in the avoidance of additional expenditures for increasing plant capacity. The company summarizes its position by stating that all moneys expended for advertising were designed to improve operating revenues, reduce operating expenses, and to maintain rates at a level consistent with the requirements of efficient and economical service.

### 8. *Vista-Florida Telephone System*

This company had incurred no advertising on promotional expenses when its response was filed. However, it urges that it be given the right to engage in advertising and promotional programs and that no rule of general application be adopted since each particular company's needs differ. It also urges that the programs of each utility be considered on a case by case basis when rate relief is sought.

### 9. *Gulf Telephone Company*

Gulf takes the position that any determination made with respect to such expenditures should be accomplished in conjunction with a rate proceeding rather than through a general investigation. Its expenditures are now confined to building goodwill among its customers and to protect its interests from unregulated competitive enterprises. In the event some ceiling is placed on the amount of advertising expense, it asks that consideration be given to the amount of non-utility revenue derived from yellow page advertising as an offset to total advertising costs.

### 10. *West Florida Telephone Company*

Presently, West Florida uses the medium of the local newspaper and radio for selective information advertising. It also uses local billboards occasionally for special messages and inserts a monthly calendar with the customer's bill. All of its advertising, points out the company, is beneficial to both the subscriber and the company and is designed only to increase the efficient use of facilities, improve service, and either reduce the cost of service or keep it from increasing. It urges that all expenses be examined only when rate proceedings are in process rather than through the general investigation process.

## 11. *Florida Telephone Corporation*

During 1972, Florida Telephone spent less than ½ of 1% of total revenues for advertising. This amounted to approximately 8 cents per customer per month. Translated into dollars, this percentage figure was $89,650. Its advertising program is used as a means of communication with its present and future customers and is primarily designed to inform them with respect to the current accelerated expansion and service improvement program. Thus, its program is largely information and educational in nature rather than promotional. Specifically, the company's major communications objectives in 1972 were to (1) inform its customers of the need for a general rate increase, (2) its conversion of a number of central offices to the Dial "1" method of DDD, (3) the completion of 4 new exchanges, and (4) a campaign to emphasize the importance of telephone people. It takes the position that advertising of this nature should be considered a cost of doing business, and that such expenditures are in the interests of both the ratepayers and the company.

## 12. *Florala Telephone Company, Inc.*

Florala annually distributes during the Christmas holiday season calendars to its subscribers for the purpose of creating goodwill among its customers. It also purchases advertisements in various civic and school related publications in the interest of community goodwill. During 1972, it had total advertising costs of $1,346 which it contends are reasonable in order to attain and retain public support in its community.

## 13. *General Telephone Company of Florida*

General's advertising policy, in broadest terms, is based on the policy that there is a positive need to promote the company's goods and services, inform and educate customers, and to create a favorable corporate image. It categorizes its advertising efforts into four areas — (1) promotional advertising, (2) informational advertising, (3) image advertising, and (4) community relations advertising.

Promotional advertising includes advertising for long distance calling, extension telephones, and premium services and is designed to maximize the usage, and return on, its investment in outside and central office facilities. Informational advertising is done for the purpose of providing customers with information as to how to obtain the maximum possible benefits from their existing equipment and services. Examples of this are reduced vacation rates, long distance rate-time period, and DDD. Image advertising, on

the other hand, encompasses communication messages whose primary intent is to enhance the regard of the general public for the company. For example, it has advertised messages dealing with obscene calls, instructions for school age children using telephones, and to strengthen its image as a supplier of communications on a competitive basis. Community affairs advertising involves the company's efforts to participate in a wide range of community activities. These efforts include a wide variety of non-mass media advertising activities such as youth safety programs, community parades, and exhibits, and other selected specialized community events.

In 1973, its total local advertising costs were approximately $583,500; additionally, approximately $231,200 was allocated to the company as a pro-rata share of national advertising undertaken by its parent corporation. Thus, local advertising expenditures amounted to 6.5 cents per customer per month while the combined local and national costs amounted to approximately 9 cents per customer per month.

In order to gauge the effectiveness of its advertising program, the company looks at the results of its vacation rate disconnect service and the number of customers who now utilize this service. It also notes the increase in long distance messages and attributes this in part to the $146,000 expended in 1973 to promote long distance calling. Thus, using these examples, the company contends the effectiveness of its advertising is quite apparent.

In summary, the company asserts that its advertising programs benefit its subscribers and that management should retain the prerogative of keeping advertising practices in line with current needs and changing times.

### 14. Central Telephone Company of Florida (Southeastern)

Southeastern, and its wholly owned subsidiary, Florida Central Telephone Company, take the position that rules should not be adopted which would limit the amount of advertising expenses for ratemaking purposes. Should any restrictive rule be adopted, Southeastern asserts it will not change its present practices but will continue to make what it considers to be valid and proper advertising expenditures. The objectives of the company in terms of advertising policies is to inform the general public of the best use of services it provides; to advise the public of company programs, plans and actions; to build investor confidence and attract investor money; and to help increase revenues. Those objectives are accomplished by informing the customer of changes in operations, rate changes, product and service offerings, and all other activities that affect their service. The company also attempts to

build confidence by the public in the company and its policies in order to recruit competent employees and attract capital on favorable terms. It is also aware of the inroads made into its market for optional services by unregulated competitive firms and has, therefore, keyed much of its advertising in the business market to meet this competition. It sums up its position by describing its advertising policy as a carefully planned and executed program designed to economically present a variety of messages to its customers and which is clearly in the public interest.

### 15. *Southern Bell Telephone and Telegraph Company*

This company, which is the largest in the state, initially points out that it has a basic need to inform its many customers of the type of telephone service and equipment that will be of the most use to them. Beyond this, it has an obligation to encourage the use of certain services in order to increase revenue and the use of certain calling patterns to reduce expenses.

It describes its objectives as being three, the first of which is to inform the subscriber as to what services are available and how the customer can most effectively and economically utilize these services. Examples of such advertising are special toll calling rates and optional offerings such as Touch-Tone service. Its second objective is to increase revenues and this is accomplished through the promotion of toll calling and so-called vertical services. The company contends these revenues help to meet the overall revenue requirements and thereby relieve the burden of basic telephone rates. It points out, for example, that the volume of toll services has grown by 123.9% between 1967 and 1972 in comparison to a growth in customers of 25.7%. The reduction in expenses due to changes in usage patterns, which is the third objective, is centered around DDD calls, placing toll calls in off-peak periods, and encouraging a reduction in the load on directory assistance operators.

The company also is billed its pro-rata share of participation in broadcast advertising conducted by the Bell System. Thus, it shares in the cost of the joint effort of all Bell operating companies in the sponsorship of various broadcast programs.

It also utilizes a bill insert to its customers advising them of available services, rates, usage procedures, and other items of aid to the subscriber, and places posters in its business offices and on its trucks as a means of reaching all subscribers through a relatively inexpensive means.

With respect to institutional advertising, the company contends it does not currently conduct so-called "image" advertising per se, but asserts that advertising of this nature may be clearly justified

under certain circumstances from time to time. It does, however, participate in promotional advertising on a very selective and limited basis by sponsoring what it describes as "a few outstanding events." It justifies this participation on the basis that it has a responsibility as a citizen in the community to include this means of advertising as part of its total advertising program.

It sums up its position by stating that its advertising and promotional practices are conducted in the best long term interest of the customers, and that its prudent use of advertising continues to be the most economical means for the company to communicate with its customers.

### 16. *United Telephone Company of Florida*

During 1972, United spent approximately $23,923 for advertising purposes. Of this amount, $16,344 was classified as informative type advertising, that is, to describe the company's application of human and technical resources to provide subscribers with adequate service and its efforts to keep up with the population boom within its service area. The company also spent $3,490 in area wide advertising designed to explain savings by DDD and calling during off-peak hours. The remainder of expenses was devoted to local service advertising to explain number changes, 7-digit dialing, and similar information to the subscribers.

The company also pays its pro-rata share (5.19%) for services performed by its parent company, which includes certain forms of institutional advertising. The principal objective of this advertising is to advise investors of United's business activities and to attract investment dollars for financing requirements. It points out that as a result of such advertising, United was able to sell bonds at a rate of 7½% in 1972 and this had a most favorable impact on the total effort to raise much-needed new capital.

The company states it desires to engage in two kinds of advertising in the future and that both are legitimate operating expenses for ratemaking purposes. First, it wishes to conduct a general advertising program designed to increase business that is supplementary to basic essential service and to provide subscribers with information concerning United's efforts to deliver quality service in a rapidly growing market and the operational factors which enhance or limit the company's ability to do so. Second, it desires to engage in advertising related to specific purposes. This type of advertising is designed to inform subscribers of rates for various services, billing and deposit practices, procedures to be followed in emergencies, safety precautions, and the like. It also encourages the use of various services like DDD and off-peak calling. Finally, it includes such things as informing the customer of construction

and installation work in progress, of changes in office hours, etc., and advertising to retain current customers from its competitors in the terminal equipment and intercity market area.

With respect to promotional advertising, the company presently engages to a limited degree in such activities as exhibits and demonstrations at fairs or community centers. These expenditures are minimal and are for the purpose of enabling it to act as a good citizen in the community.

In summary, the company suggests that the commission should not adopt any rule relative to advertising and promotional expenses but consider instead the program of each company on an individual basis in conjunction with a rate application.

### 17. *North Florida Telephone Company*

North Florida first points out that an advertising program should be designed to acquaint present customers with the availability of existing services which will improve the efficiency of the total system and reduce the overall cost to the subscriber, encourage more efficient utilization of the existing facilities, be instructive, actually save the subscriber money, and be in the interest of the public. With these objectives in mind, the company believes that from time to time it is necessary to engage in advertising and that good communications with the public is beneficially productive to the subscriber and the utility. It urges that the commission not adopt a rule applicable to future advertising programs but instead judge each utility's program on an individual basis at the time that utility's rate application is being considered by the commission.

### The issues

The primary issue in this docket is whether standards of general application to all telephone companies should be prescribed by the commission with respect to advertising and promotional expenditures by the telehone companies. Many of the companies have taken the position that rules of general application should not be adopted since economic conditions change from time to time, the size and characteristics of the companies vary, and what may be a reasonable standard for one company may be unreasonable for another. Actually, we foresee no particular problems which may arise by reason of delineating standards for all telephone companies. For example, regardless of size, all companies must adhere to uniform service standards which have been promulgated by the commission. Similarly, the commission has adopted one set of rules, which are codified as Chapter 25-4, Florida Administrative Code, which cover a number of areas applicable to a telephone company's operations. Moreover, a uniform set of standards will contain some

degree of flexibility so that if undue hardship results to a particular company, some recourse is available to it to prevent an inequitable situation from occurring. Thus, we have no difficulty in concluding that the standards which we are hereinafter prescribing shall be applicable on a statewide basis, without exception, to all telephone companies subject to our jurisdiction.

A second issue which confronts us is whether this commission possesses the authority under either existing statutes or by decisions of the Supreme Court to disallow for ratemaking purposes certain expenses of the telephone companies which relate to advertising. Some companies have suggested that as long as there is no abuse of managerial discretion such expenses must be included in the setting of rates. To support this principle they have cited a number of judicial decisions involving the allowance of advertising expenses as operating costs. See, for example, West Ohio Gas Co. v. Public Utility Comm. of Ohio, 294 U.S. 63 (1935); New England Tel. and Tel. Co. v. Dept. of Public Utilities, 275 NE 2d 493; and Petition of New England Tel. and Tel. Co., 66 A. 2d 135. The Supreme Court of Florida has recently laid to rest the question of whether this commission possesses the authority to disallow an expenditure by a public utility for ratemaking purposes where appropriate justification for same exists. Gulf Power Company v. Bevis, 296 So.2d 482 (Fla. 1974). Thus, the issue now is not whether we have the authority to disallow the expenditures but simply whether, in our judgment, the expenditures are made in the public interest and should be considered for ratemaking purposes.

While the appropriate terminology to be used in this docket is not an issue as such, we do note there is little concensus among the respondents as to what practices fall within a certain category of advertising. Thus, it will be helpful to describe in general terms the various forms of advertising to which this investigation is directed. First, promotional advertising can generally be defined as that advertising which is designed to induce any person, whether he be a subscriber or not, to select or install products or services offered by a telephone company. A second category of advertising falls within that which his known as informational advertising or consumer advertising, and is designed to provide information with respect to methods and techniques in order to obtain the greatest benefits from equipment and services used; to inform the customers of rates, charges and conditions of service, of appropriate safety precautions and emergency procedures, and similar matters. A third category is known as community affairs advertising and refers to participation in matters relating to community activities. A final category is image or institutional advertising and includes that advertising which is designed to enhance or preserve the corporate

image of the company, and to present it in a favorable light to the general public and to potential investors in its securities. It includes a wide range of activities, depending on which particular company is involved. There is, of course, some overlapping by reason of secondary benefits flowing from one to another. However, our discussion will be within the framework delineated hereinabove.

### Discussion

At the outset, we should note again that each of the affected telephone companies has been given ample opportunity to present its position on the issues raised herein, both through formal responses as well as through testimony and exhibits at the public hearings held in this docket. We also note that when our inquiry was initiated, we required the companies at that time to submit detailed information describing the basic reasons for such practices and justification for consideration of such expenses for ratemaking purposes. This included, of course, the obligation of the companies to show how such expenditures provide benefits to the ratepayers and thus are in the public interest.

While the energy crisis and environmental concerns have prompted investigations of electric and gas utility advertising in this state, and others, the fact that these two concerns have not had a significant impact upon the telephone industry in no way disminishes the necessity for scrutiny of telephone utility expenditures. It is clearly this commission's responsibility to examine the expenses which are made by a utility in order to determine the revenues necessary to permit it to earn a fair rate of return on its investment. In the course of this process, the commission must exercise its judgment and determine whether an expenditure is reasonable and in the public interest. If it is not, then it must be disallowed and absorbed instead by the stockholders of the company. With these introductory observations in mind, we will now turn to an analysis of the four types of advertising which have been delineated hereinbefore and apply the "reasonable" and "public interest" standards to them.

Promotional advertising is engaged in by most, if not all, of the affected companies. While the trend among regulators has been to discourage increased consumption of the product offered by public utilities, the telephone industry can easily be distinguished from the electric and gas industries since conservation and energy measures in that sense do not apply to telephone service. The promotion of greater usage of telephone services, such as extension telephones and premium instruments, has a beneficial effect on the ratepayer for it produces additional revenues to the company without any measurable effect on the existing plant facilities. While we are hereinafter categorizing advertising which promotes in-

creased toll calling during off-peak hours as informational advertising, it necessarily overlaps to some degree with promotional advertising. The revenues derived from this form of advertising obviously serve as a substitute to obtaining a like amount of revenues through increases in basic exchange service. Thus, these types of expenditures are reasonable and in the interest of the ratepayer. Although some companies have chosen to classify advertising designed to meet competition from those unregulated companies which offer communications services and businesses as institutional or within some other category, this type is clearly promotional in nature for it enables a company to either retain or add equipment which is susceptible to being replaced by competitive firms. Because of the magnitude of the inroads made by competitive firms to regulated companies, as is reflected in the record, and because such advertising is necessary to maintain a healthy industry, this form of promotional advertising should be allowed on a reasonable basis. The preceding conclusions are made with the caveat that a utility's service should be reasonably adequate in order for it to continue to promote greater usage of its services through promotional advertising. If, for example, a company's level of service falls below established minimum standards, its revenues can be better spent, in our judgment, on upgrading service rather than through promoting extension telephones and the like. To clarify our intent herein, it is not our purpose to preclude a utility from engaging in promotional advertising merely because one exchange has a less than desirable level of service. Instead, we intend to base our decision on the level of service from a company-wide standpoint.

The second broad category of advertising is described as informational or consumer advertising and is designed to inform the subscribers of rates, charges and conditions of service, of benefits and savings available to them, and of proper safety precautions and emergency procedures, and similar matters. Examples of this form of advertising include messages regarding changes in rates, direct distance dialing, long distance ratetime period, directory closing dates, completion of new exchanges, instructions for school age children using the telephone, billing and deposit practices, emergency procedures, number changes, how to use seven digit dialing, reduced vacation rates, and the like. Such expenditures obviously serve a needed purpose and provide the public with necessary information relating to their telephone service. Moreover, the record reflects these expenditures are minimal in relation to total revenues and constitute only a small part of total advertising expenses heretofore incurred by the companies. Therefore, we conclude that these costs should be allowed in the ratemaking process inasmuch as they are reasonable and proper and in the public interest.

The third category of advertising is community affairs advertising and includes such expenditures as sponsorship of community endeavors, youth programs, parades, exhibits at civic functions, advertising in school publications, and the like. The benefits from this form of advertising closely parallel the benefits derived from institutional or image advertising. Almost all companies have taken the position that certain expenditures are necessary in order to maintain their role as good citizens in the community. In some smaller communities, the telephone company is one of the larger businesses and is presumedly expected to sponsor various local events and participate in various forms of advertising. While these expenditures cannot be said to be extravagent, since small amounts of money are involved, no tangible benefit accrues to the ratepayer by the mere fact that the company is viewed by the public as having satisfied its civic responsibilities. There may be certain circumstances when expenditures that fall within this broad category may serve a useful purpose and be in the public interest. Included within this class are financial aid to groups, organizations, charitable and educational institutions and the like, sponsorship of community affairs, and community support materials and educational support materials such as films and slides. Prior to engaging in these activities for ratemaking purposes, each utility shall furnish the commission with sufficient information regarding the nature and purpose of such expenditure so that the commission may evaluate the proposal and advise the utility whether such expenditure will be allowed for ratemaking purposes. Similar approval shall also be obtained by each company which intends to mail its subscribers bill stuffers which convey a message which falls within any category of advertising as defined hereinabove. We do not foresee any unusual burden placed upon the companies in reaching such a conclusion since we expect them to exercise reasonable judgment and prudence consistent with our discussions herein.

The final category of advertising is defined as image or institutional advertising and simply is designed to enhance the public's image of the telephone company. It includes a multitude of varied messages by the companies such as advertising to enhance its ability to attract capital, informing customers of the need for rate increases, advising the importance of telephone people, environmental advertising, the furnishing of calendars to customers, and dues in clubs and organizations, except professional societies. The larger companies, which are faced with raising capital through investors, take the position that such advertising is absolutely essential in order to attract capital at favorable terms. However, we are not convinced that a favorable rate on long term bonds is obtained as a result of so-called image advertising by the company. Factors

such as the prevailing economic conditions, the market, and the utility's earnings weigh heavily on the investors' minds and are determinative of the interest rate to be obtained. There is little evidence, if any, in the record which indicates what benefits are derived by the ratepayer from this form of advertising. The burden of enhancing the image of the companies in the minds of the public should be borne by the stockholders in the absence of any evidence to the contrary. Low rates, good service, and good financial statements can do more to preserve the corporate image than any amount of advertising can do. Thus, all forms of advertising which fall within this category shall be hereinafter disallowed for rate-making purposes.

It is therefore ordered that the findings herein be and the same are hereby approved in every respect. It is further ordered that each telephone company subject to the commission's jurisdiction shall hereafter adhere to the conclusions contained in the main body of this order. It is further ordered that this docket is hereby closed.

By order of Chairman WILLIAM H. BEVIS, Commissioner WILLIAM T. MAYO and Commissioner PAULA F. HAWKINS, as and constituting the Florida Public Service Commission, this 22nd day of November, 1974.

*William B. DeMilly*
Administrative Secretary